[No. C051988. Third Dist. June 22, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
LARRY BUFFINGTON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I, II, and IV of the Discussion.

## COUNSEL

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Mary Jo Graves, Chief Assistant Attorney General, Michael P. Farrell, Julie A. Hokans and Sarah J. Farhat, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ROBIE, J.**—A defendant is committed to the custody of the State Department of Mental Health under the Sexually Violent Predator Act (SVPA) if a jury finds beyond a reasonable doubt that the defendant has been "convicted of a sexually violent offense against one or more victims" and "has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (Welf. & Inst. Code,[1] § 6600, subd. (a)(1); see *id.*, § 6604.)

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

Here, to raise a reasonable doubt that defendant Larry Buffington was a sexually violent predator (SVP), the defense called psychologist Theodore Donaldson to testify that in his opinion defendant was able to control his sexually dangerous behavior. To show the psychologist's bias or prejudice, the People cross-examined him about the facts of three other SVPA cases in which he had testified and his opinion that those defendants were not SVP's.

In the published part of this opinion, we hold that the facts of the three other SVPA cases and the psychologist's opinion in those cases were not relevant to show his bias or prejudice, but we reject defendant's argument that the error in admitting the evidence was prejudicial.

In the unpublished part of the opinion, we reject defendant's three other arguments alleging insufficient evidence to support the recommitment, evidentiary error, and instructional error.

We therefore affirm the judgment recommitting defendant to the custody of the State Department of Mental Health for an additional two years under the SVPA.

## FACTUAL AND PROCEDURAL BACKGROUND

### A

### *The Prosecution*

Dr. Dawn Starr and Dr. John Hupka, two psychologists who conduct SVPA evaluations for the State Department of Mental Health, and Dr. Gabrielle Paladino, defendant's former treating psychiatrist at Atascadero State Hospital (Atascadero), interviewed defendant and reviewed his files. Based on the interviews and defendant's history, all three concluded defendant met the statutory definition of an SVP.

Defendant's history encompassed the details of his prior sexual offenses, his behavior in prison, and his behavior at Atascadero. Defendant's criminal history included a violent crime spree from September 1978 to May 1979. On September 1, 1978, defendant entered the home of a 14-year-old girl while she was sleeping, forced her into the backyard, told her he wanted to "lay her," and threatened her with death if she screamed. The girl's father interrupted the attack, and defendant fled. Two months later, on October 28, 1978, defendant entered the house of a 69-year-old woman in the middle of

the night while her granddaughter was in bed with her, demanded money from the woman, and raped her at knifepoint. Three months later, on January 30, 1979, defendant choked a 16-year-old girl who had been sleeping and then raped her while her 13-year-old sister was in the house. Three weeks later, on February 17, 1979, defendant raped a 23-year-old woman at knifepoint while her baby was in bed with her and threatened to kill them both if the woman told anyone about the attack. Three weeks later, on March 9, 1979, defendant raped a 39-year-old woman while her children were in the next room, put her in a closet, and then left. Two weeks later, on March 22, 1979, defendant raped a 54-year-old woman at knifepoint in her home, became angry when he was "not able to initially reach a climax," threatened to shoot her with a gun, forced her to orally copulate him, and threatened to sodomize her and place the knife in her vagina if she did not cooperate. Eight days later, defendant raped a 38-year-old woman while her children were in the house and made one of the children take off her clothes and lie on the floor. Less than two weeks later, on April 9, 1979, defendant entered the home of a 29-year-old woman, demanded money, and told her he had a knife and "want[ed] her." He fled after the woman's son woke up and the victim ran out of the house. At this point, defendant was arrested and held until May 2, 1979, when he was released after posting bail.

Approximately two weeks after being released, defendant raped a 23-year-old woman at knifepoint in her house after he had demanded money from her. Seven days later, on May 26, 1979, he threatened a 44-year-old woman at knifepoint in her house, told her he had "killed four people already so [she] better do what [he] sa[id]," and repeatedly tried to have intercourse with her. Two days later he entered the home of a 54-year-old woman, hit her on the head, told her to "play with his penis so he c[ould] obtain an erection," raped her, demanded money from her, put her in a closet, and threatened to kill her if she came out. Defendant was arrested for his crimes on June 7, 1979, when he was approximately 19 years old. He was incarcerated for approximately 27 years.

While in prison in 1987, defendant masturbated in front of a female staff member and threatened to kill another female staff member.

In 1991, he was moved to Atascadero because he complained about "problems with his mood and paranoia and hallucinations." He later admitted he feigned those symptoms to get transferred to Atascadero where the living situation for inmates was much easier. While at Atascadero, he "implied" to a social worker he had committed more rapes than those for which he was "caught." During the 11 months defendant was at Atascadero, "he had repeated problems with female staff where he was hostile and enraged with them."

When defendant was returned to prison in 1992, he reported "hearing voices telling him to hurt females." In April 1994 and again in June 1994, he masturbated in front of a female correctional officer. After the first episode he was given a warning. After the second episode he was given a "serious disciplinary write up."

In May 1996, defendant was evaluated under the SVPA. He told the evaluating doctors "that something uncontrollable led him to sexually offend," he "couldn't stop," and believed if he had not been caught, he would have eventually killed someone.

Defendant was committed to Atascadero as an SVP in February 1997, and within three months he was seen sitting naked on his bed and heard making "abusive" comments to female staff. He made several more inappropriate comments to or about female staff from 1998 to 2003.

Defendant was involved in physical altercations with other inmates at Atascadero in March 1998 and May 2003. In the 1998 incident, defendant punched an inmate in the bathroom because he had not served defendant "seconds" in the food line fast enough. The victim needed 12 stitches to his face. In the 2003 incident, defendant punched another inmate because he spit on defendant. The victim was knocked unconscious and fractured his skull.

While at Atascadero, defendant began a five-step sex offender treatment program. He participated only in phase one—the "informational" part of the program. He attended substance abuse treatment "off and on" and appeared "generally committed . . . to being free from drugs and alcohol."

Since the end of 2003, defendant had not made any derogatory remarks toward female staff, had not crossed "boundaries," and had not been involved in any physical altercations.

Based on the foregoing review of defendant's history, Dr. Starr gave defendant a score of seven on the Static-99 test, which was in the high range of risk. Dr. Hupka and Dr. Paladino gave defendant a score of five, which was in the medium to high range of risk. They also diagnosed defendant with paraphilia not otherwise specified, antisocial personality disorder, bipolar disorder, and substance abuse.

Paraphilia consists of recurrent and intense sexually arousing fantasies or urges. It is not something that can be cured, but it can be controlled. Dr. Starr believed defendant suffered from paraphilia because he had victimized multiple women over an 11-month period with the time period between the offenses narrowing, he had a girlfriend when he committed the assaults, he appreciated the serious consequences of his crimes because he threatened many of his victims if they reported the crimes, and he had a strong drive to rape, as he continued his crime spree even when released on bail in 1979.

Antisocial personality disorder is an "enduring pattern of inner experience that deviates markedly from the person's individual culture and . . . tends to have an early onset." Those with the disorder have a greater risk of reoffending.

Bipolar disorder is characterized by mania, depression, and mood instability, often with periods of stability in between the episodes. Dr. Starr believed defendant was in clinical remission, but she "need[ed] to see a longer period of stability" before she could say he no longer had the disorder. She believed that since 2004 defendant had "demonstrated that he can control himself."

In addition to the testimony of these expert witnesses, the People called defendant to testify. On the stand defendant admitted he had previously lied under oath and to the examiners "for personal gain." His motive in committing the sex offenses was robbery and "[i]t just led into" rape. He could not recall the details of the offenses because he was under the influence of drugs or alcohol when he committed them, but not a day went by that he did not think about "the ugly things" he had done. He was motivated not to commit another felony because he would spend the rest of his life in prison if convicted. He did not have a mental illness and was not at risk to reoffend. He did not continue with the second phase of the sex offender treatment program because of the "label," "among other reasons."

B

*The Defense*

Dr. Theodore Donaldson, a licensed clinical psychologist, evaluated defendant in March 2001 and updated his evaluation in November 2005. Defendant was very angry in his first interview but had "mellow[ed]" and

become "reasonable, rational, polite, [and] informative" by his 2005 interview. Dr. Donaldson did not diagnose defendant with paraphilia because such a diagnosis was "[v]ery, very controversial" for "rape behaviors." In Dr. Donaldson's opinion, defendant had been able to control his sexually dangerous behavior at Atascadero because although he had "act[ed] out," he had not sexually assaulted anyone.

Dr. Christopher Herd, a licensed forensic and criminal psychologist, interviewed defendant in November 2005. In Dr. Herd's opinion, "[t]here was sufficient evidence to conclude there was not a diagnosable mental disorder." Defendant was "externally driven" or "opportunistic" rather than "internally driven by some sort of abhorrent psychological process." Defendant currently was "well able to modulate his behavior and his responses" although he had not been able to do so in the past. Defendant's improved behavior was partly due to his participation in Alcoholics Anonymous (AA) and Narcotics Anonymous (NA), which were available to him "anywhere around the world at virtually anytime."

In addition to AA and NA, defendant participated in the thinking skills program at Atascadero, which is a "cognitive behavioral relapse prevention program" run by a Catholic chaplain. He also participated in the violence abatement committee, which included talking with patients after a staff member at Atascadero was brutally beaten.

If released, defendant planned to live with his fiancée whom he had met "over the phone" approximately one year ago. She had no concerns about defendant staying with her. She had "developed some understanding of the availability of [AA and NA] around where [she] live[d]" and was "okay" with defendant attending those meetings.

## DISCUSSION

### I, II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III

#### The Error in Admitting Evidence of Other SVPA Cases Was Not Prejudicial

Defendant contends the trial court prejudicially erred in allowing the People to cross-examine Dr. Donaldson about his opinion in three other

---

*See footnote, *ante*, page 446.

SVPA cases that those defendants did not qualify as SVP's. This testimony included the facts of the other SVPA cases. The court admitted this evidence, finding it "ha[d] some relevance." We agree with defendant the evidence was not relevant for the People's stated purpose but disagree that its admission was prejudicial.

We begin our discussion with the testimony of the three other SVPA cases about which Dr. Donaldson gave his opinion, then explain why the evidence was not relevant to show his bias or prejudice, and conclude with why the admission of the evidence was not prejudicial.

A

*Testimony Regarding the Other SVPA Cases*

In 2001, Dr. Donaldson "wrote an opinion" in the James Burris case. In July 1981, Burris knocked on the door of a woman who was home with her 16-month-old daughter and raped the woman using a screwdriver. In August 1981, he knocked on the door of another woman and tried to rape her using a screwdriver, but her husband interrupted the assault, and Burris fled. Burris was convicted of the first rape, and while he was out on bail pending sentencing, he attacked a woman in a parking lot with a knife, took her to a nearby location, and raped her. He was sent to prison, released in 1991, reincarcerated based on a parole violation, and rereleased in 1993. In November 1993, he lured a seven-year-old girl into his house and raped her. In Dr. Donaldson's opinion, Burris did not have a diagnosed mental disorder.

In 2002, Dr. Donaldson testified in the Carl Johnson case. Johnson had molested an 11-year-old boy in 1966 and spent time in an Indiana mental hospital as a "criminal sexual psychopath." When he was released, Johnson went to Tennessee where he orally copulated a 12-year-old boy, attempted to sodomize another 12-year-old boy, abducted another minor boy and sodomized him in a church basement, and then sodomized a fourth boy. For these crimes Johnson was sentenced to five years in prison. When Johnson was released in 1974, he went to California. Three years later he was convicted of sodomizing and orally copulating a 16-year-old boy who had physical disabilities. He served 10 years in prison. In 1992 Johnson was "committed" for sodomizing and orally copulating a 15-year-old boy. In Dr. Donaldson's opinion, Johnson was able to control his sexually dangerous behavior.

In 2004, Dr. Donaldson testified in the Bradley Miller case. Miller admitted to molesting 20 to 25 boys from 1971 to 1991. In Dr. Donaldson's opinion, "there was insufficient evidence for a diagnosis of pedophilia" because the evidence indicated criminal behavior, not a mental disorder.

As Dr. Donaldson explained on redirect examination, no amount of criminal activity creates a mental disorder. For a condition to qualify as a mental disorder under the Diagnostic and Statistical Manual of Mental Disorders, it must be due to dysfunction within the individual. Conflicts between the individual and society, including sexual ones, are not disorders unless they are due to this dysfunction.

B

*The Evidence Regarding the Other SVPA Cases Was Not*
*Relevant to Show Dr. Donaldson's Bias or Prejudice*

The People contend the evidence of the other SVPA cases was relevant to show Dr. Donaldson's bias or prejudice for impeachment. In their view, "[s]uch an attack on Dr. Donaldson's credibility was relevant to the weight of his testimony in the present case that [defendant] did not suffer from a diagnosed mental disorder." We disagree.

We begin with the evidence that was admissible to show Dr. Donaldson's bias and then contrast that evidence with the evidence at issue here and explain why it was not relevant.

At trial, the People elicited without objection evidence that Dr. Donaldson is a well-paid expert witness who routinely has reached conclusions favorable to the defense. For example, Dr. Donaldson admitted during cross-examination that only 24 of the 254 offenders he evaluated met the SVPA criteria, he disagreed 90 percent of the time with the state's experts about which offenders met the SVPA criteria, he earned approximately $180,000 in one year from doing SVPA cases, and he and defense counsel are good friends.

This evidence was relevant because a rational inference can be drawn that the more defendants for whom Dr. Donaldson testifies, the more he is not giving his true opinion in these cases, or that his analysis is not as trustworthy as it might be. As a matter of common sense, the fact that a

well-paid expert witness routinely offers opinions in favor of SVP defendants in a great number of cases has some tendency in reason to prove he is not being entirely objective in formulating his opinion.

With this understanding of relevance in mind, we turn to what happened here. After the People elicited the unobjectionable testimony we have just described, Dr. Donaldson was asked about the facts of three SVPA cases in particular and his opinion in those cases. Had he been asked just about whether he had testified three times before in favor of SVP defendants, that would not have been nearly as relevant to show bias as much so as dozens and dozens. At some point, the sheer number begins to suggest bias, where a few instances would not.

Eliciting Dr. Donaldson's opinion about those three cases only had a tendency in reason to suggest bias if the jury had some other basis for concluding that the given facts reasonably should have led to a different opinion. If the state had put on an expert witness who offered an opinion that under the bare bones facts described, regardless of anything else, it would not be reasonable to find the absence of a mental disorder, then it might have been permissible to elicit testimony that Dr. Donaldson reached the opposite conclusion under those facts. That would go, not so much to show bias, but to undercut the value of Dr. Donaldson's opinion in this case. In other words, if the jury credited the testimony of the People's expert witness, then it could reasonably discredit Dr. Donaldson's contrary conclusion in the earlier cases, and by extension in this case. (If his opinion was not reliable three times before, why should the jury believe it is now?)

Without such contrary expert testimony, however, the only thing the jury had to rely on in questioning Dr. Donaldson's opinion in the three other SVPA cases was its own lay instinct that someone who commits those acts must have a mental disorder. But to be an SVP, a person must have a diagnosed mental disorder (§ 6600, subd. (a)(1)), and a lay jury had no basis for offering a medical diagnosis. Thus, even if the jury's gut lay instinct told the jury that someone who acts in a certain way must be mentally disturbed, and anyone who concludes otherwise is wrong and his opinions unreliable, that would not be a reasonable basis for rejecting the psychologist's testimony.

■ To be relevant, evidence must have a tendency in reason to prove or disprove a fact in dispute. (Evid. Code, § 210.) Here, the fact in dispute could be deemed the reliability of the psychologist's opinion. That Dr. Donaldson, in three previous cases involving men who committed multiple sex offenses,

found no mental disorder did not have a tendency in reason to prove his opinion in this case was unreliable unless the jury had some basis in reason to reject the reliability of the psychologist's opinion in those cases. In this case there was no basis in reason for that inference. ■ Nor could the jury rely on common sense, because common sense cannot tell the jury whether someone has a diagnosed mental disorder. As the SVPA makes clear, that is a matter for those qualified to make diagnoses. (§ 6601, subd. (d).)

For these reasons, the evidence of the three other SVPA cases in which Dr. Donaldson gave his expert opinion was not relevant to show his bias or prejudice. The court therefore erred in admitting the evidence.

## C

### *The Error Was Not Prejudicial*

Defendant contends the admission of evidence relating to other SVPA cases "undermined the fundamental fairness of [his] trial, denying him the federal due process guarantee of a fair trial." According to defendant, "[t]he lurid details of the unrelated cases" drew the jury's attention away from "the real issues in this case," "led to the inaccurate suggestion that Dr. Donaldson always came down on the side of the defense," and "unfairly shifted the burden to [defendant] to prove he was distinguishable from Johnson, Miller, and Burris."

"[G]enerally, violations of state evidentiary rules do not rise to the level of federal constitutional error. [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 91 [24 Cal.Rptr.3d 507, 105 P.3d 1099], fn. omitted.) Contrary to defendant's suggestion, there was nothing about the erroneous admission of the evidence here that demonstrates infringement of any of his constitutional rights. "Accordingly, the proper standard of review is that announced in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243], and not the stricter beyond-a-reasonable-doubt standard reserved for errors of constitutional dimension (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710–711, 87 S.Ct. 824])." (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103 [31 Cal.Rptr.2d 321, 875 P.2d 36].) Under *Watson*, we must consider whether, after an examination of the entire cause it appears reasonably probable the defendant would have obtained a more favorable outcome had the error not occurred. (*Watson*, at p. 836.)

Here, there was no reasonable probability of a more favorable outcome had the court excluded evidence of the other SVPA cases. While the facts of the other SVPA cases were graphic, they were not more graphic than the facts of defendant's offenses. For example, jurors were told that during a nine-month

period defendant raped or assaulted 11 women ranging in age from 14 to 69. During many of these attacks, the women were in their homes, defendant used a knife or other physical force, he continued the attacks in the presence of children, and he was undeterred even when arrested and released on bail.

Moreover, the other SVPA cases were not a focus of the case against defendant. Rather, the People noted that defendant had stipulated to the existence of the predicate sex offenses, and they argued he was diagnosed with paraphilia, substance abuse, and antisocial personality disorder, and his mental disorders made him likely to engage in sexually violent predatory behavior. The People stressed that the jurors and not the psychologists were responsible for deciding whether the People had proved the case against defendant and that defendant's repeated lies proved he was still a risk. Importantly, the People did not mention the facts of the other SVPA cases once in closing argument. In fact, when discussing Dr. Donaldson's alleged bias, the People referred only to the salary he earned from his work on SVPA cases, the special rate he charged Sacramento County for his services, and the small number of cases in which he had found individuals to be SVP's.

Finally, even if it could be argued that Dr. Donaldson's opinion about the other SVPA cases undercut his opinion that defendant was not an SVP, the defense as a whole was not undermined. Dr. Donaldson was not the only witness for the defense, and in fact he was not the only defense expert witness. Consistent with Dr. Donaldson, Dr. Herd also believed defendant was not an SVP, based on his opinion defendant did not have a mental disorder as defined by the statute and believed defendant currently was able to modulate his behavior and responses due to his voluntary participation in AA and NA.

Contrary to defendant's position, there is nothing to suggest that "[t]he effect of discrediting Dr. Donaldson inevitably spilled over into the jury's evaluation of the entire defense case" or that in this case the admission of the evidence "unfairly shifted the burden to [defendant] to prove he was distin-guishable from Johnson, Miller, and Burris."

In sum, there was no reasonable probability of a more favorable outcome to defendant had the court excluded evidence of the other SVPA cases.

## IV

### *The Court Did Not Err in Refusing Defendant's Pinpoint Instructions**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Butz, J., concurred.

**SCOTLAND, P. J.,** Concurring.—Did the prosecutor go too far in showing that a defense expert's opinion testimony that defendant is not a sexually violent predator was based not on principle, but on profit? The majority conclude the trial court erred in failing to rein in the prosecutor. I disagree.

Dr. Theodore Donaldson, a clinical psychologist, testified as an expert for the defense and opined there was insufficient evidence that defendant had a diagnosed mental disorder which makes him likely to engage in sexually violent criminal behavior. Donaldson so opined despite defendant's history of committing numerous violent sex offenses against adult women and young girls.

The prosecutor was permitted to cross-examine Dr. Donaldson about his apparent bias in favor of defendants in Sexually Violent Predator Act (SVPA) cases. Among other things, the court allowed the prosecutor to raise specific facts underlying Donaldson's expert opinions in favor of defendants in three other SVPA cases. The majority find fault in this latter ruling. In their view, "the facts of the three other SVPA cases and the psychologist's opinion in those cases were not relevant to show his bias or prejudice . . . ." (Maj. opn., *ante*, at p. 448.) To the contrary, the cross-examination was probative and proper.

The majority have no quarrel with the cross-examination that elicited that Dr. Donaldson was a well-paid expert (earning about $180,000 in one year for his testimony in SVPA cases), who routinely reached opinions favorable to defendants in such cases (disagreeing 90 percent of the time with the state's experts in the 254 SVPA cases in which he has testified), and who was defense counsel's friend. As the majority readily acknowledge, this evidence

---

*See footnote, *ante*, page 446.

"was relevant because a rational inference can be drawn that the more defendants for whom Dr. Donaldson testifies, the more he is not giving his true opinion in these cases, or that his analysis is not as trustworthy as it might be. As a matter of common sense, the fact that a well-paid expert witness routinely offers opinions in favor of SVP defendants in a great number of cases has some tendency in reason to prove he is not being entirely objective in formulating his opinion." (Maj. opn., *ante*, at pp. 454–455.) Stated simply, the evidence was relevant to show that Donaldson is biased in favor of defendants in SVPA cases because he can profit by being a hired gun for the defense in those cases.

The problem, as the majority see it, is that the facts of other cases in which Dr. Donaldson has testified for SVPA defendants were not relevant to his bias unless "the jury had some other basis for concluding that the given facts reasonably should have led to a different opinion." (Maj. opn., *ante*, at p. 455.) That other basis, the majority say, could come only in the form of contrary expert opinion about those other cases, which was not introduced here. I am not persuaded.

The repetitive nature of defendant's sex crimes was very much like the repetitive nature of the sex crimes committed in the three other SVPA cases.

Over a period of time, defendant (1) awoke a 14-year-old girl in her home, forced her into the backyard, told her he wanted to "lay her," and threatened to kill her if she screamed, (2) entered the home of a 69-year-old woman at night and raped her, (3) choked a sleeping 16-year-old girl and raped her while her 13-year-old sister was in the house, (4) raped a 23-year-old woman at knifepoint while her baby was in bed with her and threatened to kill them both if the woman reported the rape, (5) raped a 39-year-old woman while her children were in the next room, (6) raped a 54-year-old woman at knifepoint in her home, became angry when he could not ejaculate, threatened to shoot her, forced her to orally copulate him, and then threatened to place a knife in her vagina and sodomize her if she did not cooperate, (7) raped a 38-year-old woman while her children were in the house, and made one of her children undress and lie on the floor, (8) entered the home of a 29-year-old woman and—before running away when confronted by the woman's son—told her that he had a knife and "want[ed] her," (9) raped a 23-year-old woman at knifepoint in her house, (10) threatened a 44-year-old woman at knifepoint, told her he had killed four others so she better do what he wanted, and tried repeatedly to rape her, (11) entered the home of a 54-year-old woman, hit her on the head, told her to play with his penis so he could get an erection, then raped her and threatened to kill her, (12) masturbated in front of a female staff member at Atascadero State Hospital, and threatened to kill another female staff member, after he was

incarcerated there, (13) implied to a social worker that he had committed more rapes than those for which he was caught, (14) twice masturbated in front of female correctional officers after he was transferred to a prison facility, (15) told doctors that "something uncontrollable led him to sexually reoffend" and that he would have eventually killed someone if he had not been caught, and (16) exposed himself to female staff and made abusive comments to them after he was again committed to Atascadero State Hospital.

Despite defendant's history of numerous violent sex offenses, Dr. Donaldson opined there was insufficient evidence to establish that defendant had a mental disorder making it likely he would continue to commit such offenses if he were released from custody. Donaldson explained, the "thing that makes it a mental disorder is that the person is driven to something they [sic] don't want to do, and they [sic] feel bad about it and it's cycling, because of the cycling of the urges with the guilt and so forth." Because he saw no evidence of such "cycling," Donaldson opined that defendant's behavior was not evidence of a mental disorder; rather, "[w]hat you have evidence of is criminal behavior." As for defendant's conduct and comments after being placed in custody, Donaldson testified that although "[w]e make a lot out of sexual innuendos," defendant's remarks and conduct simply reflected anger or, perhaps, misguided "humor."

The conduct of the defendants in the three other SVPA cases, and Dr. Donaldson's opinion testimony in those cases, were as follows:

A person (1) molested an 11-year-old boy and was committed to a mental hospital as a "sexual psychopath," (2) molested a 12-year-old boy after being released from the mental hospital, (3) attempted to sodomize another 12-year-old boy, (4) abducted a boy and sodomized him in the basement of a church, (5) sodomized another boy and was committed to prison, (6) sodomized and orally copulated a 16-year-old developmentally disabled boy after being released from prison, and was again incarcerated, and (7) sodomized and orally copulated a 15-year-old boy after being released from incarceration. Opining that the person did not have a mental disorder which resulted in his sex crimes, Dr. Donaldson explained there was insufficient evidence that the person had been unable to control his sexually dangerous behavior; rather, in Donaldson's view, the person simply "chooses to do whatever he wants to do."

Another person admitted molesting 20 to 25 boys over a period of 20 years. Opining there was insufficient evidence that the person was a pedophile or had some other mental disorder which resulted in the sex crimes, Dr. Donaldson explained that the conduct simply "indicated" "criminal behavior and . . . doesn't identify mental disorder."

The third person (1) raped a woman, while armed with a screwdriver, when she was at home with her 16-month-old daughter, (2) attempted to rape another woman while armed with a screwdriver, (3) attacked a woman in a parking lot with a knife and raped her, for which he was committed to prison, and (4) lured a seven-year-old girl into his house and raped her after he was released from prison. Dr. Donaldson opined that the person did not have a mental disorder which resulted in the sex crimes. Thus, the prosecutor inquired, "no amount of criminal activity creates a mental disorder?" and "[d]oesn't matter whether it was one sex offense or a thousand sex offenses, that by itself does not create a mental disorder . . . ?" Donaldson replied, "That's correct . . . ."

Under the circumstances of this case, the relevancy of the aforesaid cross-examination was not dependent upon there being other expert testimony contradicting Dr. Donaldson's opinions about the defendants in the three other SVPA cases.

First, the prosecutor presented expert opinion testimony in this case discrediting Dr. Donaldson's theory that repeated acts of violent sexual misconduct are insufficient to establish that a person has a mental disorder making the person a danger to the health and safety of others in that the person is likely to engage in sexually violent behavior. Therefore, the jurors had a basis, founded upon the expert testimony in this case, to conclude that Dr. Donaldson's opinions in the other three cases were meritless and demonstrated his bias to profit by testifying as a defense expert in SVPA cases. Stated another way, because Dr. Donaldson's theory in the other cases was the same as his theory in this case, it was unnecessary to introduce contrary expert opinion regarding the persons in the other cases.

Second, criminal conduct can be circumstantial evidence that the person has a mental disorder that causes the behavior. The fact that normal people do not forcibly rape adult women and young girls or forcibly sodomize and orally copulate young boys is not so beyond the understanding of lay persons to preclude jurors from considering the facts of the prior cases, along with the contrary expert opinion in this case, to resolve whether Dr. Donaldson is biased in favor of sexually violent predators in order to profit from the giving of his expert opinion in such cases.

Third, the facts of the three prior cases were relevant to put into perspective Dr. Donaldson's opinions in those cases and, thus, to assist the jurors in assessing the prosecutor's argument that Donaldson's opinions were illogical and motivated not by principle, but by personal profit.

Accordingly, in my view, the trial court correctly permitted the prosecutor to pursue this line of cross-examination.

In all other respects, I concur in the majority's analysis and in the affirmance of the judgment.

A petition for a rehearing was denied July 11, 2007, and on July 10, 2007, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied September 25, 2007, S154695.