NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by e-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Rockingham
No. 2018-0341

THE STATE OF NEW HAMPSHIRE

v.

JAMI CASTINE

Argued: January 9, 2020
Opinion Issued: April 24, 2020

Gordon J. MacDonald, attorney general (Elizabeth C. Woodcock, assistant attorney general, on the brief and orally), for the State.

Christopher M. Johnson, chief appellate defender, of Concord, on the brief and orally, for the defendant.

BASSETT, J. The defendant, Jami Castine, was convicted on two charges of first degree assault against the minor victim, see RSA 631:1, I(d) (2016), as well as one charge of an enhanced felony version of second degree assault against the victim's brother, see RSA 631:2, I(a) (2016); RSA 651:6, I(e) (2016). The Trial Court (Delker, J.) sentenced the defendant to a stand-committed prison sentence of 10-to-20 years on one of the first degree assault convictions, a consecutive 10-to-20 year sentence on the enhanced second degree assault conviction, and a consecutive 10-to-20 year sentence on the second first degree assault conviction that was suspended in its entirety for a period ending 10 years from the defendant's release. The defendant appeals the trial court's denial of her motion to set aside the jury's verdict, and for

judgment notwithstanding the verdict, as to one of her two first degree assault convictions. She argues that one of the first degree assault convictions must be reversed because the evidence at trial was insufficient to exclude the reasonable conclusion that the injuries and serious bodily harm alleged in the two first degree assault indictments were the result of a single act. We agree that one of her first degree assault convictions must be reversed, and remand. We note that the defendant does not challenge her other convictions.

The jury could have found the following facts. The victim's mother (Mother) has four children, including the victim. In November 2014, a friend introduced Mother to the defendant, who had provided babysitting services to the friend. Between March 4 and April 8, 2016, when the victim was approximately eighteen months old, Mother left him in the defendant's care for varying periods of time.

On March 28, Mother took the victim from the defendant because the defendant told her he had been vomiting, refusing to eat or drink, and his lips were very dry. Mother took the victim to Elliot Hospital where he was examined by Dr. D'Aprix, an emergency room physician who diagnosed him with viral gastroenteritis. He was given medication for nausea and an electrolyte solution to treat dehydration. The victim returned to the defendant's care on March 31.

On April 8, the defendant left the victim in her boyfriend's care at their home while she went out. Approximately ten minutes after the defendant left, the victim began crying or screaming. The defendant's boyfriend testified that he picked the victim up from his crib, and the child "went limp" and became unresponsive. The defendant's boyfriend summoned help from the defendant's family and the victim was taken to Exeter Hospital, later transferred to Elliot Hospital, and finally "med-flighted" to Boston Children's Hospital, where he was examined on April 9 by Dr. Ianniello. According to the medical testimony at trial, the victim had sustained, among other injuries, two subdural hematomas, consisting of an area of bleeding on "the front top part on the left side [of the brain] and . . . also one on the right side," as well as "retinal hemorrhages and a retinal detachment."

The defendant was convicted of first degree assault on one indictment alleging that she recklessly caused "serious bodily injury to [the victim] . . . by inflicting non-accidental trauma, in the form of retinal hemorrhaging and detached retinas," and on a second indictment alleging that she recklessly caused serious bodily injury to the victim "by inflicting non-accidental trauma, in the form of brain bleeds." The defendant argues that "in the face of expert testimony that one cannot know whether the brain and eye injuries resulted from the same or separate blows, the State failed to prove the requisite separate blows necessary to support the separate convictions and sentences."

To convict the defendant of first degree assault as charged, the State was required to prove, beyond a reasonable doubt, that the defendant "recklessly cause[d] serious bodily injury to a person under 13 years of age." RSA 631:1, I(d). In State v. Lynch, 169 N.H. 689 (2017), we held that the unit of prosecution for the form of simple assault criminalizing "[r]ecklessly caus[ing] bodily injury to another," RSA 631:2-a, I(b) (2016), was "each individual act of causing bodily injury to another," Lynch, 169 N.H. at 708. We concluded that "[t]he plain language of the statute establishes that the legislature has criminalized the act of recklessly causing bodily injury — not each individual injury." Id. Relying upon Lynch, the defendant contends, and the State does not dispute, that the unit of prosecution under RSA 631:1, I(d) in this case is each act of knowingly or recklessly causing serious bodily injury to a person under 13 years of age, not each individual injury. We agree. Accordingly, to convict on both first degree assault charges, the State was required to prove that the victim's "retinal hemorrhaging and detached retinas," as charged in the first indictment, and his "brain bleeds," as charged in the second indictment, were caused by separate acts.

"A challenge to the sufficiency of the evidence raises a claim of legal error; therefore, our standard of review is de novo." State v. Vincelette, 172 N.H. 350, 354 (2019). "Although our general rule is that we will uphold a jury's verdict unless no rational trier of fact could have found guilt beyond a reasonable doubt, we employ a different test when the evidence is solely circumstantial." State v. Woodbury, 172 N.H. 358, 363 (2019) (citation omitted). "In the latter circumstance, to be sufficient to sustain the verdict, the evidence must exclude all reasonable conclusions except guilt." Id.

The defendant argues that we must use the standard we apply in solely circumstantial evidence cases because the State had no direct evidence that she caused the victim's brain and eye injuries by means of more than one assault. We agree. As the defendant notes, "No eyewitness testified to seeing [the defendant] assault [the victim] even once with such force as would cause the brain and eye injuries." Nor did the defendant confess to any such assaults. Rather, the State's case depended upon drawing inferences from medical opinion testimony as to when the injuries occurred, the defendant's access to the victim at those times, eyewitness testimony as to the defendant's maltreatment of the victim and his fear of her, the exclusion of other possible perpetrators, and the defendant's attempts to "cover her tracks" with implausible explanations for the victim's injuries.

Because the evidence as to an element of proof in this case was "solely circumstantial, it must exclude all reasonable conclusions except guilt." Vincelette, 172 N.H. at 354.

> [T]he proper analysis is not whether every possible conclusion consistent with innocence has been excluded, but, rather, whether

3

all reasonable conclusions based upon the evidence have been excluded. We do not review each circumstance proved in isolation or break the evidence into discrete pieces in an effort to establish that, when viewed in isolation, these evidentiary fragments support a reasonable hypothesis other than guilt. Rather, we must consider whether the circumstances presented are consistent with guilt and inconsistent, on the whole, with any reasonable hypothesis of innocence.

Id. at 354-55 (citation omitted).

The defendant argues that, because the medical experts could not determine whether the victim's injuries resulted from one blow or from multiple blows, one reasonable conclusion consistent with the evidence and, therefore, inconsistent with guilt on two first degree assault charges, is that a single blow caused the eye injury and the brain injury. Therefore, the defendant argues, the evidence is insufficient to sustain two first degree assault convictions. We agree.

The jury heard testimony from several physicians who treated the victim, including Dr. D'Aprix and Dr. Ianniello, as well as physicians who had reviewed the victim's medical records, including Dr. Chan and Dr. Ricci. The jury heard expert testimony that both types of injuries the victim sustained — subdural hematomas and retinal hemorrhaging/detachment — could result from the same mechanism and that those injuries commonly occur together. Several medical experts opined that the injuries could have been the result of a single inflicted trauma or separate inflicted traumas, and that it was not possible to determine with any certainty whether the injuries with which the victim presented on April 8 occurred at the same time or separately.

Dr. Ianniello stated: "I think unfortunately we can't say whether this all happened in one incident or if there was repeated trauma." She specifically testified that whether the bleeding in the victim's brain had been the result of one or multiple events, the presentation would have been the same and agreed with counsel that "[i]t would not be possible to determine [from the CT scans taken on or after April 8] whether [the victim] had any preexisting subdural hematomas because if there was a prior [subdural hematoma], the blood would just mix with the new blood and it's difficult to tell about a preexisting hematoma." Similarly, when asked if she had an opinion as to whether the victim's injuries occurred at the same time or at different times, Dr. Chan testified: "Commonly, all — all these things can occur with the same event. They're all . . . consistent with the acceleration deceleration injury, so given the fact that it would be such a significant injury, commonly it would happen all together." And Dr. Ricci testified that "[t]ypically [subdural hematomas and retinal hemorrhages] occur together," and typically one would not see "that degree of retinal hemorrhages without some form of brain injury." When asked

4

whether there is any way to determine chronologically when these two separate traumas may have occurred or whether they came at the same time, he testified: "No, I — I don't think there's any way to determine with any precision when these injuries happened, other than the subdural hematomas were not acute, not fresh." None of the other experts testified to the contrary.

The State readily admits that the medical evidence was not conclusive as to the dates of the injuries. Nevertheless, the State argues that the defendant made several statements from which the jury could have inferred she had repeatedly hit the victim. In addition, the State points to evidence that the victim was afraid of the defendant. The State also notes that Dr. Ricci testified that "one can have subdural hematomas . . . without retinal hemorrhages," which the State argues "certainly left the possibility open that the injuries happened on separate occasions." Finally, the State contrasts Dr. Ricci's testimony that the victim presented with symptoms on March 28 "that could have been related to pre-existing head trauma," with Dr. D'Aprix's testimony supporting a finding that the victim did not present on March 28 with the bruising of the upper and lower eyelid that was evident on April 8. The State then concludes that this testimony shows that the victim "could have suffered head trauma before his March 2016 emergency room visit and additional trauma, causing the eye injuries, including retinal hemorrhaging, after that visit."

We are not persuaded. Although the evidence relied upon by the State might arguably support a finding that the defendant abused the victim on more than one occasion, that evidence fails to exclude the reasonable conclusion that the serious bodily injuries alleged in the two indictments were caused by a single blow. As the defendant points out, statements that she made indicating that the victim had been repeatedly assaulted by someone other than herself could reasonably reflect a desire to explain bruising not causally-connected with the serious bodily injuries alleged in the indictments. Similarly, evidence of the victim's fear of the defendant, while consistent with the victim having been repeatedly abused, does not exclude the reasonable conclusion that the serious bodily injuries alleged in the indictments resulted from a single blow.

Nor are we persuaded by the State's argument that the testimony of Dr. Ricci and Dr. D'Aprix shows that the victim "could have suffered head trauma before his March 2016 emergency room visit and additional trauma, causing the eye injuries, including retinal hemorrhaging, after that visit." On its face, this argument fails. Proof that the victim "could" have suffered head trauma before his March emergency room visit does not exclude all reasonable conclusions other than guilt.

The State relies upon Dr. Ricci's opinion that the victim's symptoms presenting at his March emergency room visit "could have been related" to pre-existing head trauma. Given the evidence in this case, determining whether

5

the victim's symptoms at his March emergency room visit were related to head trauma requires the application of specialized medical knowledge. Accordingly, the lay jury could not have concluded, based on evidence of the victim's symptoms, that the victim had suffered pre-existing head trauma absent expert testimony supporting such a finding. Cf. State v. Martin, 142 N.H. 63, 65 (1997) (lay witness may not testify competently about a medical diagnosis, and "may not draw conclusions which require application of specialized medical knowledge"); People v. Buffington, 152 Cal. App. 4th 446, 455 (Ct. App. 2007) (stating that "lay jury had no basis for offering a medical diagnosis").

Here, the State points to expert testimony that the victim "could" have suffered pre-existing head trauma. "Could" is "used to indicate possibility." New Oxford American Dictionary 394 (3d ed. 2010). In the civil realm, where facts need be proved only by a preponderance of the evidence, expert medical testimony based on "could" has been held to lack the definiteness required to meet even that lower burden of proof. See Kelly v. Cutch, Inc., 938 N.W.2d 102, 108-09 (Neb. Ct. App. 2019); Taglianetti v. Jo-Dee Corporation, 239 A.2d 192, 193 (R.I. 1968) (physician's opinion expressed in terms of "could be related" and "very possible" does not legally establish causation (emphasis omitted)); Paulsen v. State, 541 N.W.2d 636, 643 (Neb. 1996) ("We have held that expert medical testimony based on 'could,' 'may,' or 'possibly' lacks the definiteness required to meet the claimant's burden to prove causation."); cf. Bronson v. The Hitchcock Clinic, 140 N.H. 798, 802 (1996) (quantum of expert testimony necessary to survive a motion for directed verdict must be enough to conclude that causal link "probably" existed).

In this criminal case, where the evidence must meet the much more demanding "proof beyond a reasonable doubt" standard, we conclude that the expert medical evidence relied upon by the State in its brief is not sufficient to sustain two first degree assault convictions. Dr. Ricci's opinion that the victim's symptoms "could have been" related to pre-existing head trauma does not exclude all reasonable conclusions except guilt. On the record before us, the fact that the victim's symptoms "could have been" related to pre-existing head trauma does not exclude the reasonable conclusion that the symptoms, in fact, were not so related. Accordingly, we conclude that, contrary to the State's argument, the evidence does not support a finding beyond a reasonable doubt that the victim suffered head trauma prior to his March 28 emergency room visit.

Furthermore, although the State contends that the evidence would support a jury finding that the victim "suffered head trauma" prior to his March 28 emergency room visit, such a finding, standing alone, would be of little value. In the absence of proof beyond a reasonable doubt that that head trauma also resulted in the serious bodily injury alleged in the indictment, specifically, the "brain bleeds," the fact that the victim sustained head trauma prior to the March 28 visit would not exclude the reasonable conclusion that

6

the "brain bleeds" were the result of the same blow that caused the eye injuries, a conclusion that is inconsistent with a guilty verdict on two first degree assault charges.

The State fails to point to any evidence that would support a jury finding beyond a reasonable doubt that before the March 28 emergency room visit, the victim suffered brain bleeds. Even if we agreed with the State that the evidence supported a finding that the victim suffered head trauma prior to the March 28 visit, whether that head trauma resulted in brain bleeds is again a matter requiring application of specialized medical knowledge. The only expert testimony relied upon by the State is Dr. Ricci's testimony that "one can have . . . bleeding on the surface of the brain without retinal hemorrhages." That testimony falls far short of opining that the victim was suffering from bleeding on the surface of the brain at the time of the March emergency room visit. Moreover, that testimony is only part of Dr. Ricci's response. Dr. Ricci was asked whether it was possible that the subdural hematomas occurred independently from the retinal hemorrhages in this case. His full response was:

> Typically they occur together. So I would say — we wouldn't typically see that degree of retinal hemorrhages without some form of brain injury. So I — I think given in this case, they could well have happened at the same time. On the other hand, one can have subdural hematomas or bleeding on the surface of the brain without retinal hemorrhages, although the opposite is less true.

Thus, it is clear that Dr. Ricci was not opining that it was more probable than not that the subdural hematomas occurred prior to the retinal hemorrhages.[1]

Nor does the State point to evidence that would permit the jury to find, beyond a reasonable doubt, that any head trauma suffered prior to the March emergency room visit resulted in the "serious bodily injury" alleged. "'Serious bodily injury' means any harm to the body which causes severe, permanent or protracted loss of or impairment to the health or of the function of any part of the body." RSA 625:11, VI (2016). In this case, viewed in the light most favorable to the State, there was evidence that on or before March 28, the victim was pale, vomiting, not eating, dehydrated, had diarrhea, fever, decreased activity level, and his eyes had been seen rolling in the back of his head. However, Dr. D'Aprix, who diagnosed the victim on March 28 as having viral gastroenteritis, testified that, when examined, the victim had no fever and

---

[1] Indeed, the very next question asked of Dr. Ricci after he gave the response quoted above was whether there was "any way to determine chronologically when these two separate traumas may have occurred, that is, which came first and whether they came at the same time." In response, Dr. Ricci stated: "No, I — I don't think there's any way to determine with any precision when these injuries happened, other than the subdural hematomas were not acute, not fresh [on April 8]."

his pupils were normal. When asked whether it was "possible" that the victim had both "the flu and a head injury," he agreed that was possible, but stipulated that in his opinion it would have been "a mild head injury." The evidence is undisputed that the victim responded well to the treatment he received on March 28 — Dr. D'Aprix testified that he was much more active, eating and drinking without further vomiting, and that he was stable for discharge home. Mother testified that after leaving the hospital, the victim was "feeling better," eating, drinking, and playing, though he looked "a little tired." When asked how the victim was doing on March 30, she testified that "[h]e was doing great." She stated that "he was back to eating and drinking. He wasn't pale, took his normal naps, and up running around." Dr. Chan, who reviewed the records from March 28, testified that the victim's improvement based on the treatment he received that day was not consistent with his having a "severe brain injury."

While evidence of serious bodily injury was presented to the jury, that evidence related to the victim's condition after he was hospitalized on April 8; that is, after he had suffered both brain and eye injuries. None of that evidence was tied to the symptoms with which he presented on March 28. Thus, even if we were to assume that the victim did suffer head trauma prior to his March 28 visit, we would conclude that the evidence does not support a finding beyond a reasonable doubt that that head trauma resulted in the "brain bleeds" and serious bodily injury alleged in the indictment.

In sum, we conclude that the evidence was insufficient to exclude the conclusion that the injuries and serious bodily harm alleged in the two first degree assault indictments were the result of a single act — a reasonable conclusion that is inconsistent with a finding of guilt on both first degree assault charges. Given the evidence in this case, the jury could not have reasonably concluded that the victim's injuries and serious bodily harm were, beyond a reasonable doubt, the product of different acts. Accordingly, we reverse the denial of the defendant's motion to set aside verdict and for judgment notwithstanding the verdict to the extent that it requested the trial court to enter a judgment of not guilty on one of the two first degree assault convictions, and remand.

Reversed and remanded.

HICKS, HANTZ MARCONI, and DONOVAN, JJ., concurred.

8