# IN THE SUPREME COURT OF CALIFORNIA

NICHOLAS NEEDHAM,

Petitioner,

v.

THE SUPERIOR COURT OF ORANGE COUNTY,

Respondent;

THE PEOPLE,

Real Party in Interest.

S276395

Fourth Appellate District, Division Three

G060670

Orange County Superior Court

M-16870

---

July 1, 2024

Justice Corrigan authored the opinion of the Court, in which Chief Justice Guerrero and Justices Kruger, Jenkins, and Evans concurred.

Justice Groban filed a concurring and dissenting opinion, in which Justice Liu concurred.

---

NEEDHAM v. SUPERIOR COURT

S276395


Opinion of the Court by Corrigan, J.


Under the Sexually Violent Predator Act (SVPA or the Act) (Welf. & Inst. Code,[1] § 6600 et seq.), a person convicted and imprisoned for certain sex offenses may be civilly committed for treatment in a secure facility following completion of a prison term. The Act sets out the procedures for formally evaluating a defendant as a potential sexually violent predator (SVP), as well as for initiating and litigating a commitment petition. In *People v. Superior Court* (*Smith*) (2018) 6 Cal.5th 457 (*Smith*), we concluded the People[2] may share discovery of the defendant's treatment records with their retained expert. (*Id.* at pp. 469–472.) Here we resolve two additional questions regarding the People's retained expert. We hold that, although the People may call their retained expert to testify at trial, both to contest the testimony of other witnesses and to offer an independent opinion as to whether the defendant qualifies as an SVP, the People's retained expert may not compel a defendant to be interviewed or participate in testing before trial. We reverse the Court of Appeal's contrary judgment and remand the case for trial.

---

[1]     Subsequent unspecified statutory provisions will refer to the Welfare and Institutions Code.

[2]     The Act provides that the county board of supervisors shall designate either the district attorney or county counsel to assume responsibility for pursuing SVP proceedings. (§ 6601, subd. (i).) For ease of reference, we refer to the county's designated counsel as the district attorney, the People, or the prosecution.

## I. BACKGROUND

In 2016, the Department of Corrections and Rehabilitation referred defendant Nicholas Needham for evaluation as a possible SVP. (§ 6601, subd. (a)(1).) The State Department of State Hospitals (DSH) appointed two evaluators, Dr. Jeremy Coles and Dr. Michael Musacco, who each determined that defendant had a mental disorder making him likely to engage in sexual violence unless civilly committed and treated as provided by the SVPA. (§ 6601, subds. (c), (d).) The Orange County District Attorney's Office then petitioned to commit defendant as an SVP. (§ 6601, subd. (i).)

Before the probable cause hearing, Dr. Coles submitted an updated evaluation, changing his opinion and concluding that defendant did not qualify for commitment. As required by statute, the DSH appointed two other evaluators, Dr. Yanofsky and Dr. Korpi. (§ 6601, subds. (e), (g).) Dr. Yanofsky concluded defendant qualified as an SVP, while Dr. Korpi opined he did not. Doctors Coles, Musacco, and Korpi testified at the probable cause hearing. The trial court concluded there was probable cause to believe defendant was an SVP and ordered a trial. (§ 6602, subd. (a).) Subsequently, however, Dr. Yanofsky submitted an updated evaluation indicating he, too, had changed his opinion and no longer believed defendant qualified as an SVP.

The People retained Dr. Craig King as an expert and sought discovery of defendant's evaluations and records. Following a hearing and over defense objection, the trial court granted the request, relying on *Smith, supra,* 6 Cal.5th 457. The court later ruled that Dr. King could interview "and/or . . . test" defendant as well as obtain defendant's additional medical records. Dr. King interviewed defendant for three to four hours, covering various aspects of defendant's treatment, sexual behavior, and coping skills. The interview was audiotaped.

Defendant filed three motions to preclude Dr. King from testifying at trial. He argued, inter alia, that 1. Dr. King should not have been granted access to defendant's treatment records, 2. the Act did not authorize Dr. King to interview or test defendant, and 3. Dr. King should not be allowed to testify that, in his opinion, defendant qualifies as an SVP. The court denied these motions.

Defendant sought a writ of mandate/prohibition to prevent Dr. King from conducting any further interviewing or testing of defendant and from testifying at trial. The writ petition characterized the court's order as having permitted Dr. King to do an "evaluation" of the defendant, although the court's order did not use that term. In resolving defendant's petition, the Court of Appeal accepted that nomenclature. This characterization is not precisely accurate, however. As we explain, the Act and accompanying regulations set out in great detail all that is encompassed in a formal precommitment evaluation and provide it is to be done by DSH evaluators. What the court order permitted was an independent interview and testing by Dr. King, which, as discussed *post*, is not authorized under the Act. The Court of Appeal summarily denied defendant's writ petition. We granted defendant's petition for review and transferred the matter to the Court of Appeal with direction to issue an order to show cause. A divided Court of Appeal thereafter granted defendant's writ petition and directed the trial court to exclude Dr. King's testimony. (*Needham v. Superior Court* (2022) 82 Cal.App.5th 114, 125–129.) We granted the People's petition for review from that ruling.

## II. DISCUSSION

### A. *The SVPA, Updated/Replacement Evaluations, and the Civil Discovery Act*

The SVPA "provides for the involuntary civil commitment of certain sex offenders before the end of their prison or parole revocation

terms." (*Walker v. Superior Court* (2021) 12 Cal.5th 177, 190 (*Walker*); see § 6600 et seq., eff. Jan. 1, 1996.) The Act sets out with specificity how the SVP process is to be initiated, who may evaluate a person for possible SVP treatment, and how that formal evaluation is to be conducted. "[T]he Legislature expressed concern over a select group of criminal offenders who are extremely dangerous as the result of mental impairment, and who are likely to continue committing acts of sexual violence even after they have been punished for such crimes. The Legislature indicated that to the extent such persons are currently incarcerated and readily identifiable, commitment under the SVPA is warranted immediately upon their release from prison. The Act provides treatment for mental disorders from which they currently suffer and reduces the threat of harm otherwise posed to the public. No punitive purpose was intended." (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1143–1144 (*Hubbart*).) An SVP action is a special civil proceeding. (*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 648 (*Reilly*); *Moore v. Superior Court* (2010) 50 Cal.4th 802, 815 (*Moore*).)

"The trial represents the final step in the 'complex administrative and judicial process' required to civilly commit an individual as an SVP. [Citation.] The process leading up to a trial begins when the Department of Corrections and Rehabilitation screens inmates at least six months before their release date (§ 6601, subd. (a)), and refers any potential SVP to DSH for a 'full evaluation' (*id.*, subd. (b)). DSH then designates two practicing psychologists or psychiatrists to evaluate the inmate in accordance with a 'standardized assessment protocol,' which requires 'assessment of diagnosable mental disorders, as well as various factors known to be associated with the risk of reoffense among sex offenders.' (*Id.*, subd. (c).) If the two mental health professionals agree that the inmate qualifies as an SVP (or if only one reaches this conclusion and two

subsequently appointed professionals concur), the DSH Director forwards a request for a commitment petition, along with . . . supporting documents, to the county in which the inmate was last convicted. (*Id.*, subds. (d)–(f), (h).) If the county's designated counsel agrees, the petition for commitment is filed in superior court. (*Id.*, subd. (i).)" (*Walker, supra,* 12 Cal.5th at pp. 190–191.) If the court finds probable cause that "the individual named in the petition is likely to engage in sexually violent predatory criminal behavior upon his or her release," the case proceeds to trial. (§ 6602, subd. (a).)

Among the protections afforded to the defendant are the rights to counsel, discovery of reports and evaluation materials, retention of experts, trial by jury and proof of his status beyond a reasonable doubt. (§§ 6603, subd. (a); 6604.) The statutory provisions are augmented by title 9, chapter 15 of the California Code of Regulations, which particularizes the "standardized assessment protocol" called for by the Act. (§ 6601, subd. (c); see Cal. Code Regs., tit. 9, §§ 4000–4020.1.) The protocol describes, among other things, the qualifications required of evaluators; the questions they are to address in their evaluation report; the extensive records they are to review; a face-to-face clinical interview of the defendant, with directions as to what the interview should include; the items required for inclusion in the evaluator's forensic report; detailed citations to all documents and other sources relied upon; notation of the evaluation procedures employed; and detailed requirements for the evaluator's findings. The protocol also contains express provisions for how the evaluator is to interact with the subject. (See Cal. Code Regs., tit. 9, §§ 4011–4013.) The evaluator must write a forensic report, which the DSH certifies as the "official evaluation" before providing a copy to the court and parties. (Cal. Code Regs., tit. 9, § 4014.1; see *id.*, § 4014.)

An SVP commitment requires a finding that the person suffers from "*a currently diagnosed mental disorder* that makes the person a

danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(3), italics added.) We have rejected due process and equal protection challenges against the SVPA due in part to the Act's requirement that a currently diagnosed mental disorder has been proved. (See *Hubbart, supra,* 19 Cal.4th at pp. 1158, 1162, 1169–1170.)

*Sporich v. Superior Court* (2000) 77 Cal.App.4th 422 addressed whether the People were entitled to updated DSH evaluations of the defendant before trial and held that, at the time of its decision, "[a]n order for additional precommitment mental examinations to establish currency is simply not authorized by the SVP Act." (*Id.* at p. 427.) As a result, it rejected a claim that the SVPA implicitly countenanced such exams. The People alternatively argued that, even if the SVPA did not authorize updated evaluations, the mental examination provisions of the Civil Discovery Act (Code Civ. Proc., § 2016.010 et seq.; CDA) independently entitled them to examine the defendant. Code of Civil Procedure section 2032.020, subdivision (a) provides in part that "[a]ny party may obtain discovery . . . by means of a physical or mental examination of . . . a party to the action . . . in any action in which the mental or physical condition (including the blood group) of that party or other person is in controversy in the action." A party seeking such examination must seek leave of the court. (Code Civ. Proc., § 2032.310, subd. (a).) The court may grant a motion for a mental exam "only for good cause shown" (Code Civ. Proc., § 2032.320, subd. (a)). Recognizing an SVP proceeding is civil in nature, *Sporich* assumed the CDA applied but concluded the People failed to show good cause for additional examinations. (See *Sporich,* at pp. 427–428.)

After *Sporich*, the Legislature added what is now section 6603, subdivision (d). (See Sen. Bill No. 2018 (1999–2000 Reg. Sess.) § 2; Stats. 2000, ch. 420, § 2, p. 3139.) The provision expressly grants the

People the right to seek updated or replacement evaluations under certain circumstances: "If the attorney petitioning for commitment under this article determines that updated evaluations are necessary in order to properly present the case for commitment, the attorney may request *the State Department of State Hospitals* to perform updated evaluations. If one or more of the original evaluators is no longer available to testify . . . [the People, as petitioner] may request *the State Department of State Hospitals* to perform replacement evaluations. When a request is made for updated or replacement evaluations, the *State Department of State Hospitals shall perform* the requested evaluations and forward them to the petitioning attorney and to the counsel for the person subject to this article. However, updated or replacement evaluations *shall not be performed* except as necessary to update one or more of the original evaluations or to replace the evaluation of an evaluator who is no longer available to testify for the petitioner in court proceedings. These updated or replacement evaluations shall include review of available medical and psychological records, including treatment records, consultation with current treating clinicians, and interviews of the person being evaluated, either voluntarily or by court order. If an updated or replacement evaluation results in a split opinion as to whether the person subject to this article meets the criteria for commitment, the *State Department of State Hospitals shall conduct* two additional evaluations in accordance with subdivision (f) of Section 6601." (§ 6603, subd. (d)(1), italics added.) Evaluators are "no longer available to testify" if they failed to adhere to department protocol, had their licenses suspended or revoked, are unavailable to testify, or have resigned or retired.[3] (§ 6603, subd. (d)(1); see 6603, subd. (d)(2).)

---

[3] The statute excludes from the definition of "no longer available to testify" those evaluators who have resigned or retired who, in the

The accompanying regulations also provide that DSH has the "sole authority to designate evaluators for" updated or replacement evaluations. (Cal. Code Regs., tit. 9, § 4020.1, subd. (c).)

As noted in the bill analysis by the Assembly Committee on Public Safety, the author asserted the new law " 'would permit the prosecuting attorney to request DMH[4] to prepare updated evaluations to support the filing of a[n] SVP commitment or recommitment petition. These updates are occasionally necessary, for instance, where an evaluation has become stale with the passage of time or because the treating doctor is no longer available to testify in court. Without the update, the petition could be denied, or at least delayed until a new evaluation is obtained. In such instances, SB 2018 would avoid foreseeable delays by allowing the state's attorney to request updated evaluations in needed cases. . . . These updated evaluations will help ensure that those who are still dangerous will be committed, and those who do not meet the SVP criteria will not be committed inappropriately." (Assem. Com. on Public Safety, Analysis of Sen. Bill No. 2018 (1999–2000 Reg Sess.) as amended May 1, 2000, p. 3.) Both this analysis and a similar one by the Senate Public Safety Committee discussed the impact of the *Sporich* decision. (See *id*. at p. 6; Sen. Com. on Public Safety, Analysis of Sen. Bill No. 2018 (1999–2000 Reg. Sess.) as amended April 11, 2000, p. 6.) *Albertson v. Superior Court* (2001) 25 Cal.4th 796 (*Albertson*), observed: "The district attorney has an interest in obtaining information concerning the individual's current mental state for two reasons: to avoid

---

"most recent evaluation of the person subject to this article, opined that the person subject to this article does not meet the criteria for commitment." (§ 6603, subd. (d)(2)(D).)

[4] The State Department of Mental Health was the precursor to the State Department of State Hospitals. (See *Reilly, supra,* 57 Cal.4th at p. 647.)

committing a person who does not currently suffer from a qualifying mental disorder, and to support the commitment of a person who does suffer from a qualifying mental disorder." (*Id.* at p. 802.) We went on to hold that "[i]t is evident from its language and history that section 6603[(d)] was intended by the Legislature . . . [to clarify] the trial court's authority to order updated mental interviews and evaluations, as well as the district attorney's right of access to treatment information." (*Albertson*, at p. 804; see also Cal. Code Regs., tit. 9, § 4020.1.)

As this review demonstrates, the Act aims to balance the rights of a proposed conservatee, the need to protect public safety and provide treatment, and the goal of properly litigating a commitment proceeding. It makes clear that, while the prosecutor can request that updated or replacement evaluations be conducted, the evaluations themselves must be done by DSH. The structure and language of the Act make clear that the terms "evaluation" and "evaluator" are terms of art. (See §§ 6601, subds. (a)–(h), 6603, subds. (d), (j), (k)(1).) A precommitment evaluation is a particularly defined process, engaged in only by a DSH-appointed evaluator. For the reasons discussed below, the Act does not give the People's expert the authority to conduct a precommitment evaluation, nor does it authorize independent interviews or tests of the defendant at that stage of the process.

## B. Smith *and Experts Retained by the People*

*Albertson* explained that, in light of section 6603, subdivision (d), the prosecution "may obtain access to otherwise confidential treatment information concerning an alleged SVP to the extent such information is contained in an updated mental evaluation." (*Albertson, supra,* 25 Cal.4th at p. 807.) The Legislature later added what is now section 6603, subdivision (k), which provides:

"Notwithstanding any other law, the evaluator performing an updated evaluation shall include with the evaluation a statement listing all records reviewed by the evaluator pursuant to subdivision (d). The court shall issue a subpoena, upon the request of either party, for a certified copy of these records. The records shall be provided to the attorney petitioning for commitment and the counsel for the person subject to this article. The attorneys may use the records in proceedings under this article and shall not disclose them for any other purpose." (§ 6603, subd. (k)(1); see *Smith, supra,* 6 Cal.5th at pp. 464–468.) *Smith* reasoned "updated evaluation" in this provision included replacement evaluations. (*Id.* at pp. 467–468.) Evaluations and supporting materials are released to counsel subject to a protective order to ensure they are used only in connection with commitment proceedings. (See *id.* at pp. 464, 472.)

Although section 6603, subdivision (k)(1) authorized disclosure of treatment records relied upon by evaluators in performing an updated or replacement evaluation, the *Smith* defendant argued that confidentiality laws precluded "the government from sharing those records with its retained expert." (*Smith, supra,* 6 Cal.5th at p. 469.) *Smith* rejected the claim: "So long as attorneys do not disclose the confidential records for any *other* purpose, subdivision [(k)](1) at the very least suggests that attorneys *may* disclose them 'in proceedings under this article.' [Citation.] Given the 'critical' importance of expert testimony in an SVP proceeding [citation] — and the likelihood that counsel will need expert assistance to grasp the scientific nuances underlying another expert's opinion — the disclosure most needed by each party 'in proceedings under this article' [citation] would almost certainly be to its retained expert." (*Ibid.*) *Smith* observed that "[a]lthough the SVP determination requires proof that the person has been convicted of a sexually violent offense, the bulk of the evidence at trial typically focuses on whether the person has a diagnosed

mental disorder that makes it likely he or she will engage in sexually violent behavior. [Citation.] Accordingly, the civil commitment trial usually turns on the quality and credibility of the expert witnesses and the extent to which their evaluations are persuasive." (*Id.* at pp. 470–471.) "A key way in which one party counters an opposing expert's opinion is to uncover and challenge the expert about the bases for his or her opinion. [Citations.] This is particularly true for a mental health professional's assessment of whether an individual qualifies as an SVP. Because an evaluator exercises professional judgment within the legal framework specified by the SVPA, the evaluator's 'legally accurate understanding of the statutory criteria is crucial to the Act's proper operation.' " (*Id.* at p. 471.) *Smith* also reasoned the opportunity to cross-examine evaluators "would be a hollow one if the district attorney does not have the assistance of an expert to interpret and explain the significance of the specialized information at issue. [Citations.] Without an expert's assistance in preparing the cross-examination of adverse witnesses, 'the risk of an inaccurate resolution . . . is extremely high.' [Citation.] An expert would also need to examine the relevant records to offer an opinion about the potential SVP's mental health." (*Id.* at pp. 471–472.) *Smith* concluded: "Our society uses trials to advance the search for truth. That search generally works best when each side — and each side's experts — have access to the records and information on which the opposing side's experts rely. The Legislature adopted this reciprocal model in the current version of the SVPA." (*Id.* at p. 473.) While *Smith* established that the People's retained experts may review all the available discovery, here we consider whether those retained experts may testify at trial and, if so, whether they may offer their own opinion as to a defendant's status as an SVP.

**C.** ***The People's Retained Expert May Not Compel a Defendant to Participate in an Interview or Testing***

The People first contend the prosecuting agency in an SVP proceeding may retain an expert, not only to assist in trial preparation and presentation, but also to independently examine a defendant. They assert that nothing in the SVPA precludes the practice. SVP trials are, as noted, " ' "special proceedings of a civil nature," ' wholly unrelated to any criminal case." (*Moore, supra,* 50 Cal.4th at p. 815.) At such trials, the rules of evidence apply. (*Walker, supra,* 12 Cal.5th at p. 191; see Evid. Code, § 300.)

Initially, we reject the People's reliance on the CDA, rather than the SVPA, to answer the question here. The People suggest the CDA "supports the People's right to retain private experts, the right to have those experts examine an alleged SVP, and the right to call that expert to render an opinion at trial" based on that examination. Only the first assertion is correct. The CDA generally applies to SVP trials, which are special civil proceedings. (See *People v. Jackson* (2022) 75 Cal.App.5th 1, 8 (*Jackson*).) However, as the title of the act suggests, the CDA primarily concerns discovery between parties. Although the CDA regulates the exchange of information between the parties with regard to experts (see Code Civ. Proc., §§ 2034.210–2034.730) and provides for the *exclusion* of expert testimony as a sanction if a party fails to comply with its provisions (see, e.g., Code Civ. Proc., §§ 2034.300, 2034.310), the *admission* of expert testimony is governed by the Evidence Code, not the CDA.

Indeed, even if the CDA contains terms that may generally be applicable in a civil proceeding, such provisions must yield to more specific requirements of the SVPA. On this point, *Jackson* is instructive. In that case, the trial court excluded the defendant's expert as a sanction for failing to comply with the CDA's reciprocal discovery provisions. (See *Jackson, supra,* 75 Cal.App.5th at pp. 16–

18.) *Jackson* reasoned that SVP defendants had both a statutory (see § 6603, subd. (a)) and due process right to defense experts. In light of those protections, exclusion of such experts would only be countenanced " 'for the most egregious discovery abuse . . . in which the record demonstrates a willful and deliberat[e] violation which was motivated by a desire to obtain a tactical advantage at trial such as the plan to present fabricated testimony.' " (*Jackson*, at p. 24.) *Jackson* went on to conclude the discovery violation at issue there did not rise to that level and exclusion of the defense expert was improper notwithstanding that the CDA appeared to authorize such exclusion. (*Id.* at pp. 24–27.)

Similarly here, although the CDA generally allows one party, upon a proper showing, to conduct a mental examination of another party (see Code Civ. Proc., §§ 2032.020, subd. (a); 2032.310, subd. (a), 2032.320, subd. (a)), those provisions conflict with the SVPA's express mandates concerning the conduct of updated or replacement evaluations and the dissemination of a defendant's confidential records. As discussed, the Legislature added what is now section 6603, subdivision (d)(1), allowing the People to request updated evaluations from the DSH as "necessary in order to properly present the case for commitment," or replacement evaluations if "one or more of the original evaluators is no longer available to testify for the petitioner in court proceedings . . . ." We have recognized "the updated evaluations' primary purpose is evidentiary or informational." (*Reilly, supra,* 57 Cal.4th at p. 648.) The statutory scheme expressly authorizes release to the People of all evaluations and supporting documents. But the right is limited to evaluations conducted by DSH.

The materials to be consulted and relied upon by DSH evaluators are quite extensive and all of them are discoverable by the People. But nowhere does the Act authorize independent interviewing

or testing by a People's retained expert before a civil commitment has been imposed after a jury trial. Allowing such independent precommitment interviews and testing would permit an end run around the Act's careful and particularized balancing of the competing interests at play. As the Court of Appeal majority below observed, permitting an independent examination would permit a People's expert to interact with the defendant "free of the restrictions the Legislature imposed in [section 6603,] subdivision (d)(1)." (*Needham v. Superior Court, supra,* 82 Cal.App.5th at p. 126.)

The Act limits how formal evaluations are conducted and by whom. An initial "full evaluation" of defendant must be conducted by DSH "in accordance with a standardized assessment protocol . . . ." (§ 6601, subds. (a)(2), (b), (c).) The initial evaluations must be conducted by "two practicing psychiatrists or psychologists, or one practicing psychiatrist and one practicing psychologist, designated by the Director of State Hospitals." (§ 6601, subd. (d).) If one of those evaluators does not concur that a defendant qualifies as an SVP, the DSH must appoint two additional independent evaluators, who "shall not be a state government employee, shall have at least five years of experience in the diagnosis and treatment of mental disorders, and shall include psychiatrists and licensed psychologists who have a doctoral degree in psychology." (§ 6601, subd. (g); see § 6601, subds. (e), (f).) As noted, evaluators must also follow the detailed DSH assessment protocol (see Cal. Code Regs., tit. 9, § 4000 et seq.; *Needham v. Superior Court, supra,* 82 Cal.App.5th at p. 125, fn. 2), and any updated or replacement evaluation must also be performed in accordance with the statute. The DSH has the "sole authority to designate evaluators" for updated or replacement evaluations. (Cal. Code Regs., tit. 9, § 4020.1, subd. (c).) Section 6603 expressly provides that an evaluator who "has failed to adhere to the protocol of the [DSH]" constitutes one who is no longer available to testify so as to

14

permit the People to request a replacement evaluation. (§ 6603, subd. (d)(2)(A); see generally *Reilly, supra,* 57 Cal.4th at pp. 651–657.) By contrast, no provision of the Act mentions interviews or testing by a People's expert before commitment. Thus, it contains no regulation of the qualifications that would be required of a People's expert nor does it control how such independent interviewing or testing would be conducted. The protocol also expressly regulates the manner in which the evaluator may interact with the defendant.[5] Allowing independent examination and testing by a People's expert could potentially undermine these safeguards.[6]

---

[5] For example, the protocol requires an evaluator to "assess the Individual's ability to" communicate, comprehend, and retain verbal communication and make accommodations to conduct the interview. (Cal. Code Regs., tit. 9, § 4013, subd. (a).) An evaluator must attempt to obtain informed consent when possible, "maintain a position of neutrality with regard to the SVP law," explain "the limits of confidentiality and the Evaluator's professional and legal obligation as a mandated reporter" (*id*., subd. (c)(1)), and give no legal advice or feedback to the individual as to the evaluator's "professional opinion about whether the Individual meets" the criteria for certification (*id*., subd. (c)(2)). The protocol also provides that an evaluator should employ only those tests, instruments and risk factors that have "gained professional recognition or acceptance in the field . . . ." (Cal. Code Regs., tit. 9, § 4005.)

[6] The People's reliance on *People v. Landau* (2013) 214 Cal.App.4th 1 is misplaced. We note that *Landau* largely assumed the People could retain an expert to testify and concluded the expert could properly examine the defendant under general CDA provisions. We disapprove *Landau* to the extent it so concluded. The People also suggest they "have *not* requested a compelled mental health evaluation pursuant to [the CDA]. [We note that the people in their briefing continue to use the term "evaluation." As explained above the use of that term in this context is misplaced.] They selected a less intrusive means of obtaining an evaluation. Needham had a choice as to whether he wished to participate in an evaluation. He chose to

Other provisions of the SVPA expressly allow the People's expert to examine a defendant *after* commitment. If a committed person later petitions for conditional release or discharge, the People "shall represent the state and may have the committed person evaluated by experts chosen by the state." (§ 6608, subd. (g); see § 6605, subd. (a)(3).) Further, after a commitment, the DSH "shall have a current examination of [the person's] mental condition made at least once every year" and prepare an annual report regarding whether the person still qualifies as an SVP or whether conditional release or unconditional discharge "is in the best interest of the person and conditions can be imposed that would adequately protect the community." (§ 6604.9, subds. (a), (b); see *People v. McKee* (2010) 47 Cal.4th 1172, 1192–1193 (*McKee*).) These different provisions support the conclusion that, although the Legislature contemplated examinations by both DSH and the People's expert *after* commitment, it did not intend to authorize independent examinations by a prosecution's retained expert before a commitment has been ordered.[7]

---

participate in the process and provided his written consent to Dr. King. [Citation.] An order compelling a mental health examination was therefore unnecessary." This assertion is somewhat misleading. Although it is true that defendant signed a consent form upon Dr. King's arrival at the jail to interview him, he did so only after the court had ordered, over defense objection, that Dr. King could conduct an interview and test him. Indeed, large portions of defendant's three motions to exclude Dr. King's testimony were devoted to arguing the interview was improper and should not have been allowed. (See discussion, *ante*.)

[7] In light of our conclusion based on statutory interpretation of the SVPA, we need not address defendant's constitutional claim that compelling him to be interviewed by the People's retained expert would deny him due process. (See *Facebook, Inc. v. Superior Court* (*Hunter*) (2018) 4 Cal.5th 1245, 1275, fn. 31; *People v. Williams* (1976) 16 Cal.3d 663, 667.)

**D.** ***The People's Retained Expert May Testify at Trial and Offer an Opinion on the Subject of SVP Qualification***

Having concluded that a People's expert may not, under the Act, interview or test a defendant before a commitment has been ordered, we turn to the question of whether such an expert may nonetheless offer an opinion at trial as to whether the defendant qualifies as an SVP. Generally, an expert may testify in the form of an opinion if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact" and is based on matter "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (Evid. Code, § 801, subds. (a), (b).) However, "[t]he court may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion. In such case, the witness may, if there remains a proper basis for his opinion, then state his opinion after excluding from consideration the matter determined to be improper." (Evid. Code, § 803.)

We have recognized that "expert testimony is critical in an SVP commitment proceeding, in which the primary issue is not, as in a criminal trial, whether the individual committed certain acts, but rather involves a prediction about the individual's future behavior." (*McKee, supra,* 47 Cal.4th at p. 1192.) That inquiry is a subject beyond common experience, and a jury would be aided by expert testimony on the matter. Indeed, *Smith* affirmed that an SVP trial "usually turns on the quality and credibility of the expert witnesses and the extent to which their evaluations are persuasive." (*Smith, supra,* 6 Cal.5th at p. 471.) An expert's testimony may "assist the trier of fact in determining whether the evaluator has 'accurately understood the statutory criteria.' " (*Ibid.*) Understanding the methods and

17

reliability of diagnostic testing and evaluation undergirding an assessment of whether a person is an SVP constitutes "a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ." (Evid. Code, § 801, subd. (a); see *Smith, supra,* 6 Cal.5th at p. 469; *McKee, supra,* 47 Cal.4th at p. 1192.) So long as an expert's opinion is not based on improper matter, the Evidence Code would not preclude the relevant testimony of any expert, including one presented by the People.

Mirroring the reasoning of the Court of Appeal majority below, defendant argues the SVPA contemplates only evaluators appointed by DSH be allowed to testify at trial and that allowing the People to retain experts to testify undermines the nonpunitive nature of the Act. The majority below reasoned in part: "Virtually the entire scheme revolves around the *independent* experts who evaluate the defendant and testify concerning defendant's mental state. . . . To permit the People to retain a testifying expert would create the possibility that an expert with a clear bias — an expert hired to support the People's view, rather than provide an independent analysis — could lead to the deprivation of a person's liberty even where some independent experts find it unwarranted, or for reasons independent experts find unconvincing. That result is inconsistent with the design of the SVPA procedure." (*Needham v. Superior Court, supra,* 82 Cal.App.5th at p. 127.)

Initially, the Court of Appeal majority's suggestion that any expert presented by the People must, of necessity, be biased, misconstrues the nature of expert testimony. Not every professional disagreement signifies an impermissible bias. Even among experts, reasonable minds may simply differ. As with any compensated expert or, indeed, any witness, the opposing party is free to pursue the question of bias and the trier of fact is permitted to consider whether its presence undermines witness credibility. Yet the mere fact that a

party has called the expert to testify, or that the expert has previously testified for one side or the other, standing alone, would not establish disqualifying bias (see *People v. Buffington* (2007) 152 Cal.App.4th 446, 454–456), and nothing in the SVPA suggests an intent to exclude the People's expert from trial because such expert would be inherently biased.[8] Indeed, although *Smith* did not decide the issue here, *Smith* reasoned, in part, the People may share discovery of a defendant's confidential treatment records with their expert because it was necessary for the People to adequately challenge the testimony of DSH evaluators. *Smith* observed: "Unfortunately, as the legislative history suggests, the [DSH] ' "has not ensured that it conducts these evaluations in a consistent manner" ' and sometimes ' "evaluators did not demonstrate that they considered all relevant information." ' [Citations.] A key way in which one party counters an opposing expert's opinion is to uncover and challenge the expert about the bases for his or her opinion. [Citations.] This is particularly true for a mental health professional's assessment of whether an individual qualifies as an SVP. Because an evaluator exercises professional judgment within the legal framework specified by the SVPA, the evaluator's 'legally accurate understanding of the statutory criteria is crucial to the Act's proper operation.' " (*Smith, supra,* 6 Cal.5th at p. 471.) As *Smith* observed, there are legitimate reasons the People may wish to call its own expert to challenge the conclusions of the DSH evaluators.

Nor is permitting the expert to testify — rather than merely consult behind the scenes — inconsistent with the design of the SVPA

---

[8] As noted by the district attorney, Dr. King has not only worked as a People's expert but has previously "contracted with the DSH to conduct sexually violent predator evaluations." (See, e.g., *Jackson, supra,* 75 Cal.App.5th at pp. 11–14; *People v. Presley* (2021) 65 Cal.App.5th 1131, 1137.)

procedure. Although the SVPA's detailed provisions for the conduct of evaluations precludes additional evaluations not provided for by statute, nothing in the Act limits the presentation of relevant, otherwise admissible expert testimony. (See *Smith, supra*, 6 Cal.5th at p. 472 ["nothing in the text of the SVPA bars the government from sharing otherwise confidential information in its possession with the expert"]; *People v. Superior Court (Ghilotti)* (2002) 27 Cal.4th 888, 909, fn. 7 ["nothing in the SVPA appears to preclude the use of Department employees, including staff psychologists and psychiatrists directly involved in the treatment of an already committed person, as the initial designated evaluators"].)

In suggesting we have "reache[d] a compromise" outcome that creates an "end run" around the statute (conc. & dis. opn. of Groban, J., *post*, at pp. 5, 10), the dissenting opinion asserts we have provided "no explanation for why the Legislature would give the People a right the majority believes to be critical to the SVP proceeding (a testifying expert) but then simultaneously hamstring the People by barring the expert from interviewing the defendant, even though DSH evaluators are allowed to . . . interview the defendant." (*Id*. at p. 5) Similarly, the dissenting opinion reasons that "[i]f the Legislature believed the People already had the authority under the Evidence Code to hire their own testifying expert to opine on a person's status as an SVP, then it is unclear why it believed that, without giving the People the authority to seek updated or replacement evaluations, the People might fail to prove their case at trial and 'the petition could be denied.' " (*Id*. at pp. 9–10.)

We take the second point first. Contrary to the dissenting opinion's suggestion, the People's ability to call its own expert does not obviate the need for *current* information acquired through an updated or replacement evaluation as to whether a defendant currently suffers from a mental disorder that makes him or her a danger to others or

20

likely to engage in sexual violence. (See § 6600, subd. (a)(1)). The ability to present expert testimony is not a replacement for updated information concerning defendant's current mental status. As a result, the statutory scheme permits the People to seek updated or replacement evaluations from the DSH when appropriate. At the same time, the Legislature could reasonably conclude that access to such an evaluation, along with the ability to subpoena records reviewed by the evaluator (see § 6603, subd. (k)(1)), properly balances the People's need for information with the state's interest in controlling how evaluations are conducted, and by whom.

Nor does the provision governing the conduct of updated or replacement evaluations indicate that other expert testimony relevant to the proceedings is barred. That section 6603, subdivision (d)(2) permits the People to request updated or replacement DSH evaluations only in certain circumstances thus says nothing about the People's ability to retain and call on a non-evaluating expert to provide testimony relevant to the issues in the proceeding.

The Court of Appeal majority's analysis also misconstrues the role of DSH evaluations in the statutory scheme. As noted, DSH may forward a case for the filing of a commitment petition only if two evaluators, either the initially appointed evaluators or the later appointed independent evaluators, both "concur that the person has a diagnosed mental disorder so that the person is likely to engage in acts of sexual violence without appropriate treatment and custody . . . ." (§ 6601, subd. (d); see *id.*, subd. (f).) "[T]he requirement for evaluations is not one affecting disposition of the merits; rather, it is a collateral procedural condition plainly designed to ensure that SVP proceedings are initiated only when there is a substantial factual basis for doing so." (*People v. Superior Court* (*Preciado*) (2001) 87 Cal.App.4th 1122, 1130.) Combined with the requirement that a court find "probable cause to believe that the individual named in the

petition is likely to engage in sexually violent predatory criminal behavior upon his or her release" (§ 6602, subd. (a)), "[t]he Legislature has imposed procedural safeguards to prevent meritless petitions from reaching trial." (*People v. Scott* (2002) 100 Cal.App.4th 1060, 1063.) Once these procedural safeguards have been met, "rather than demonstrating the existence of the two evaluations, the People are required to show the more essential fact that the alleged SVP is a person likely to engage in sexually violent predatory criminal behavior." (*People v. Superior Court* (*Preciado*), at p. 1130.) As we observed in *Reilly*, "the Legislature did not intend that courts interpret section 6601's procedural requirements with unnecessary strictness to prevent the trier of fact from ultimately determining each individual's SVP status," and the Legislature has "clearly expressed [a] preference that SVPA commitment petitions be adjudicated on their merits" (*Reilly, supra,* 57 Cal.4th at p. 656), with the People bearing the burden of proof beyond a reasonable doubt (see § 6604). If, despite such preference for adjudication on the merits, the Legislature wishes to limit the People's evidence at trial to DSH evaluations, they remain free to articulate such a limitation. To date they have not done so.[9]

---

[9]    The different roles played by the initial DSH evaluations and a later opinion by an expert, whether called by the People or the defense, undermines the dissenting opinion's suggestion that there is no distinction between "a DSH-designated expert's *evaluation* under the SVPA" and "an expert's *opinion* regarding whether a person qualifies as an SVP." (Conc. & dis. opn. of Groban, J., *post*, at p. 4.) As explained, the detailed provisions of the SVPA regarding who conducts formal evaluations, and how they must do so, ensures that an SVP petition will only be filed in limited and specifically controlled circumstances. Once that procedural safeguard has been met, the scheme permits an adjudication on the merits based on relevant and admissible evidence, including expert testimony.

The Court of Appeal majority's view further ignores the extent of prosecutorial discretion built into the SVPA scheme. As discussed, the statute requires DSH to forward a request to file a commitment petition if either both of its evaluators concur a defendant qualifies as an SVP or, if they disagree, two subsequently appointed independent evaluators so concur. (§ 6601, subds. (d)–(f).) However, upon receiving such request, the People are required to file a commitment petition only "[i]f the county's designated counsel concurs with the recommendation . . . ." (§ 6601, subd. (i).) The SVPA thus empowers the People to disagree with initial evaluations that a defendant is an SVP by declining to file a commitment petition.

We have also acknowledged the People retain discretion to disagree with evaluators *after* the filing of such petition. As *Reilly* observed, "although initial evaluations conducted under section 6601 must agree, a lack of concurrence between updated or replacement evaluations does not require dismissal of the petition. [Citation.] Rather, the updated evaluations' primary purpose is evidentiary or informational. [Citation.] Mandatory dismissal is not required where one or both of the later evaluators conclude the individual does not meet the criteria for commitment." (*Reilly, supra,* 57 Cal.4th at p. 648.)[10] The People may thus disagree with postfiling evaluations that

_____

[10] The dissent suggests our reliance on *Reilly* is "inapt" because "we specifically identified in *Reilly* the remedy the People should take if they want to challenge DSH evaluations: request updated evaluations from the DSH, not hire a testifying expert." (Conc. & dis. opn. of Groban, J., *post*, at p. 13.) As we have explained, the Legislature amended the SVPA to allow the People to obtain updated evaluations for the purpose of giving them access to the latest information regarding a defendant's *current* mental condition. (See, *ante*, at pp. 6–9.) Contrary to the dissent's assertion, nothing in *Reilly* nor the SVPA suggests an updated evaluation should be used as a vehicle to challenge a prior evaluation or that the People may seek an

a defendant does *not* qualify as an SVP by presenting the case for the jury's consideration. As discussed, *Smith* reasoned the People's opportunity to cross-examine DSH evaluators at trial "would be a hollow one if the district attorney does not have the assistance of an expert to interpret and explain the significance of the specialized information at issue." (*Smith, supra,* 6 Cal.5th at p. 471.) *Smith* thus recognized the People may challenge at trial the evaluators' conclusions and to argue a contrary viewpoint.

The SVPA fully contemplates the People may disagree with the evaluators assigned to a particular case and exercise their discretion, either in refusing to file a commitment petition as an initial matter or to continue with a properly filed petition notwithstanding evaluators' subsequently changed opinions. Although the SVPA circumscribes who may conduct formal evaluations of a defendant, it is silent as to the type of evidence that may be presented at trial. Nothing in the Act suggests a legislative intent to allow the People to continue with a commitment proceeding notwithstanding evaluators' changed opinions but simultaneously to hamstring them by not allowing them to present expert testimony to counter the new opinions and bolster its contrary view of the case. Indeed, the Legislature could have required dismissal of the petition if the evaluators no longer agreed defendant qualified as an SVP. It did not do so. It would seem incongruous that the SVPA contemplated the People may retain an expert to assist in the prosecution of its case, as *Smith* acknowledged, yet bar the testimony of that same expert to assist the trier of fact. Contrary to the Court of Appeal majority's suggestion, the SVPA allows a finding that a defendant qualifies as an SVP even if the evidence is in conflict, and the People may present admissible

update simply because they disagree with an evaluator's initial conclusions. For the reasons discussed, updated evaluations cannot adequately replace the role of a retained expert.

evidence to support its case, including the testimony of an expert. As *Smith* observed, it is ultimately for the fact finder to evaluate the credibility of any witness, whether they be evaluators or experts retained by either side.

The dissenting opinion acknowledges that dismissal of an SVP petition is not required even if evaluators have changed their minds regarding defendant's qualification for commitment. (Conc. & dis. opn., *post*, at pp. 12–13.) However, the dissent suggests that "in a case where every neutral DSH evaluator agrees at the time of the commitment trial that the defendant should not be committed, it may well be quite difficult for the People to convince a jury that they should nonetheless commit the defendant as an SVP, and the People may well wish to dismiss the case in such circumstances." (*Id.* at p. 13.)

That may sometimes be the case but it may not be so in every case. If the Legislature intended that petitions should always be dismissed under such circumstances, it could simply have said so. Instead, the Legislature has taken care to articulate a highly structured process with the exercise of both medical and legal judgment and discretion at several points in that process. Experience teaches that experts are not infallible and serious consideration should accompany final resolution of the merits of an SVP petition, which has such significance for both the alleged SVP and society as a whole. For us to adopt a rule that hamstrings a balanced consideration runs counter to "the Legislature's clearly expressed preference that SVPA commitment petitions be adjudicated on their merits." (*Reilly, supra,* 57 Cal.4th at p. 656.) Allowing the People to present expert testimony challenging the bases for the evaluators' changed opinions ensures that the jury will be fairly and fully informed as they consider the case.

The Court of Appeal majority below reached a contrary conclusion, reasoning that various provisions of the SVPA implicitly barred the People from calling an expert witness other than evaluators from DSH. Its statutory analysis misses the mark. First, the majority noted that, in describing a defendant's trial rights, section 6603, subdivision (a) stated a defendant had "the right to retain experts . . . ." The majority asked rhetorically: "If the Legislature envisioned *both* parties retaining testifying experts, why only say defendant?" (*Needham v. Superior Court, supra,* 82 Cal.App.5th at p. 126.) The structure of section 6603 provides the answer. Subdivision (a) enumerates various rights to which a *defendant* facing an SVP trial is entitled. These include not only the right to a jury trial, but to the assistance of counsel, retention of experts, and the right to request DNA testing. In addition, it authorizes the appointment of counsel or experts for indigent defendants. (See Welf. & Inst. Code, § 6603, subd. (a); Pen. Code, § 1405.) This provision simply does not address the rights of the People.

The Court of Appeal majority pointed to section 6603, subdivision (b), which provides that the People have "the right to demand that the trial be before a jury." The majority suggested "the statute addresses the People's rights at trial and makes no mention at all of retaining an expert." (*Needham v. Superior Court, supra,* 82 Cal.App.5th at p. 126.) But nothing in subdivision (b) suggested it was meant to be an exhaustive list of rights granted to the People at an SVP trial. As noted, "an SVPA civil commitment proceeding is a special proceeding of a civil nature" (*People v. Yartz* (2005) 37 Cal.4th 529, 532) as to which "the Legislature may provide for a jury trial" (*Corder v. Corder* (2007) 41 Cal.4th 644, 656, fn. 7). Subdivision (b) specifically enumerates the People's right to a jury trial because, as a special proceeding of a civil nature, they would otherwise not have

such a right at an SVP trial. (See *People v. Rowell* (2005) 133 Cal.App.4th 447, 451–452; see also *In Re De La O* (1963) 59 Cal.2d 128, 150–151.)

A similar observation applies to the Court of Appeal majority's reliance on section 6603, subdivision (k)(3), which provides: "This subdivision does not affect any right of a party to seek to obtain other records regarding the person subject to this article." The court below suggested this was significant because the use of the term "party" demonstrated that "prior delegations specifically to the defendant were intentional," and "the provision entitles either party to 'obtain other records,' not to retain other witnesses." (*Needham v. Superior Court, supra,* 82 Cal.App.5th at p. 127.) This construction ignores the import of subdivision (k). That subdivision provides that an evaluator "performing an updated evaluation shall include with the evaluation a statement listing all records reviewed by the evaluator," and "[t]he court shall issue a subpoena, upon the request of either party, for a certified copy of these records." In *this* context, subdivision (k)(3) states that nothing in this subdivision affects any right to *obtain other* records pertaining to defendant. Subdivision (k)(2) provides it does not affect any right to object to introduction of subpoenaed evidence as more prejudicial than probative, immaterial or otherwise inadmissible. While subdivision (k)(2) preserves the standard application of the rules of evidence to the admissibility of information obtained during discovery, it does not regulate what trial witness may be called or by whom.

Neither does section 6603, subdivision (e), cited by the Court of Appeal majority below, support its reasoning. That provision states: "This section does not prevent the defense from presenting otherwise relevant and admissible evidence." Applying the principle of *expressio unius est exclusio alterius*, i.e., "the expression of one thing in a statute ordinarily implies the exclusion of other things" (*In re J.W.* (2002)

29 Cal.4th 200, 209), the court below asserted section 6603, subdivision (e) "strongly suggests that the People, by contrast, are confined to the evidence that the SVPA carefully designates." (*Needham v. Superior Court, supra,* 82 Cal.App.5th at p. 127.) This reasoning is not persuasive. Even if one reads subdivision (e) in the manner the Court of Appeal majority does, that "[t]his section" prevents the People from admitting certain relevant and admissible evidence, subdivision (e) itself does not describe that evidence, nor does section 6603 enumerate what evidence may or may not be admitted at trial. As such, subdivision (e) would only have the effect described by the majority below if one *already* understood section 6603, subdivision (d), the provision regarding when an updated or replacement evaluation may be obtained, as a substantive limit on the admissibility of expert testimony. We have already rejected that view and subdivision (e) adds little to the analysis.

Further, even assuming there exists ambiguity in the application of section 6603, subdivision (e), the legislative history of that provision belies the Court of Appeal majority's conclusion. Current subdivision (e) was added in 2001 in the same bill that also added current subdivision (d)(2), which defines what it means for an evaluator to be "no longer available to testify" for purposes of obtaining a replacement evaluation under subdivision (d)(1). (See Stats. 2001, ch. 323, § 2, pp. 2454–2455.) According to the bill author, a problem arose from the initial failure of the Act to define that phrase because courts instead used Evidence Code section 240's definition of witness unavailability, which "does not cover cases in which an evaluator has been replaced by the DMH." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1142 (2001–2002 Reg. Sess.) as amended July 5, 2001, p. F.) Thus, the definition of "no longer available to testify" was added in section 6603, subdivision (d)(2) to *expand* the People's ability to seek a replacement evaluation. In this

context, the Legislature also added current subdivision (e) "to state that a determination that an evaluator is unavailable to testify for the petitioner (DMH and the district attorney) shall not prevent the defense from present[ing] relevant evidence. This amendment was taken to clarify that a former evaluator can be called as a witness for the defense in an SVP matter." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1142, *supra*, at pp. K–L.) This legislative history confirms that, rather than restricting the admissibility of evidence presented by the People, the bill was intended to assure they could request replacement evaluations when an evaluator has been replaced by DSH, even if the evaluator would not technically be "unavailable" as the Evidence Code generally uses that term, and to clarify that this provision did not preclude the defense from calling the former evaluator to testify.

We find unpersuasive defendant's argument that allowing the People's expert to testify would deny him due process because it would deprive him of a fair trial. Initially, that the People's retained expert may testify notwithstanding that the expert may not have interviewed or tested a defendant does not undermine the fairness of the proceedings. Indeed, even as to a DSH evaluator, although the relevant protocol requires "a reasonable attempt to conduct a face-to-face interview with" a defendant, the protocol acknowledges that a defendant may refuse to participate, at which point the evaluator "shall document the refusal and inform the [defendant] that even without an interview, a[n] SVP forensic report shall be written and submitted." (Cal. Code Regs., tit. 9, § 4013, subds. (b), (c).) Cases have noted that defendants may refuse to meet with evaluators, in which case an evaluator's opinion is "based on documentary evidence such as state hospital records, police reports, probation reports, and prison records." (*People v. Roa* (2017) 11 Cal.App.5th 428, 445; see also *People v. Hoffman* (2021) 61 Cal.App.5th 976, 978; *People v.*

*Burroughs* (2016) 6 Cal.App.5th 378, 404; *People v. Angulo* (2005) 129 Cal.App.4th 1349, 1354–1356.) None of these cases suggested that an opinion based on evidence other than an interview or testing was fundamentally unfair. Ultimately, whether an expert has or has not examined a defendant, and why, would go to the weight to be accorded to the expert's conclusions by the fact finder, not the admissibility of the expert's testimony. (See *People v. Rodriguez* (2014) 58 Cal.4th 587, 638; see also *People v. Jackson* (2016) 1 Cal.5th 269, 327–328.)

Further, as discussed, we reject the premise of defendant's argument that such testimony contravenes the SVPA. As the dissenting justice below reasoned: "The parties have the opportunity to challenge pretrial the admissibility of their opponent's proposed expert testimony via motions filed pursuant to Evidence Code sections 402 and 405. If the testimony is admitted, the experts are subjected to the crucible of cross-examination. And then the trier of fact decides [whom] to believe. I am not convinced that proceeding in this well-established manner threatens the fairness of future SVP proceedings." (*Needham v. Superior Court, supra,* 82 Cal.App.5th at p. 130 (dis. opn. of Goethals, J.).) We agree.[11]

We emphasize that, although the People's retained expert is not precluded from testifying at trial, the defense may challenge the admissibility of such testimony in a particular case under the Evidence Code like any other expert, including, e.g., whether the person qualifies as an expert (Evid. Code, § 720, subd. (a)) or would present an opinion based on improper matter (see Evid. Code, §§ 801, subd. (b), 803). Further, in light of an SVP defendant's "due process right to a timely trial," the People may not unduly delay the proceedings for the purpose of retaining an expert, and "the trial court

---

[11] We disapprove *People v. Sloan* (2023) 93 Cal.App.5th 698, 702–703, which held to the contrary.

must take due account of the individual's interests in prompt adjudication and take decisive steps to guard against unjustified delay." (*Camacho v. Superior Court* (2023) 15 Cal.5th 354, 368.)

### E. *Conclusion*

In summary and as relevant here, the SVPA provides a highly structured process under which a convicted sex offender may be civilly committed after completion of a sentence. A formal evaluation of the defendant is a central part of that process. As discussed, such a formal, precommitment evaluation may only be conducted by evaluators appointed by DSH using the procedures and assessment protocol specified by the SVPA and relevant regulations. Independent interviews and testing by outside experts are distinct from the highly regulated evaluation process and the Act makes no provision for them. Updated and replacement evaluations may be conducted before or after a commitment petition is filed. Both a defendant and the People are entitled to a jury trial, which is civil in nature and at which the People bear the burden of proof. Both parties are entitled to discovery as the Act provides. While the CDA generally applies to civil proceedings, contrary provisions of the Act take precedence over the CDA. Except where the Act provides otherwise, the trial is conducted under the Code of Civil Procedure and the Evidence Code. The People may discover, subject to a protective order, all the reports and relied-upon information compiled during an evaluation. (See §§ 6601, subds. (d), (h)(1), 6603, subd. (k); *Smith, supra,* 6 Cal.5th at pp. 464–468.) They may retain independent experts and reveal to their expert otherwise privileged information about the defendant contained in the evaluations and supporting materials. (See *Smith*, at pp. 469–472.) Under the Act, a People's retained expert is not authorized to compel a defendant to participate in interviews and testing before the defendant is committed as an SVP. Either party may call a DSH evaluator to testify at the commitment trial. The People's qualified

expert may testify and give an opinion as to whether the defendant meets the statutory definition of an SVP. The Act also sets out different procedures that apply after a defendant has been committed. Ultimately, if the Legislature disagrees with our interpretation of the SVPA, it may revisit this area to clarify its intent regarding the testimony of the People's expert or to provide additional safeguards or clarifications.

For guidance on remand, we observe the following. If the district attorney chooses to call Dr. King, he may not rely in any way on his interview with defendant as a basis for his opinion, which must conform to Evidence Code section 803. This conclusion does not conflict with the rule from *People v. Sanchez* (2016) 63 Cal.4th 665, which affirmed that, in forming an opinion, an expert may *rely* on information inadmissible as evidence and describe such matter to the fact finder in general terms. (*Id.* at pp. 679, 685–686.) While the Evidence Code permits an expert to base an opinion on inadmissible matter, it does not permit the expert to rely on matter that is "precluded by law." (Evid. Code, § 801, subd. (b); see also *id.*, §§ 802, 803.) Because the SVPA does not authorize an independent expert to interview a defendant before commitment, Dr. King's interview of defendant would constitute matter precluded by law within the meaning of the Evidence Code. Should the district attorney choose to call a different or additional expert, any new expert would not be able to interview defendant nor rely on Dr. King's interview in forming an opinion.

## III. DISPOSITION

The judgment of the Court of Appeal is reversed.  The matter is remanded with directions to return the matter to the superior court for trial.


**CORRIGAN, J.**


**We Concur:**

**GUERRERO, C. J.**
**KRUGER, J.**
**JENKINS, J.**
**EVANS, J.**

NEEDHAM v. SUPERIOR COURT

S276395


Concurring and Dissenting Opinion by Justice Groban


The Sexually Violent Predator Act (SVPA or Act) (Welf. & Inst. Code, § 6600 et seq.)[1] allows for indefinite civil commitment of a person, not for a crime he or she has previously committed, but for a crime which he or she might commit in the future. Recognizing this as an extraordinary deprivation of liberty, the Legislature set forth multiple procedural safeguards designed to ensure that a person is committed as a sexually violent predator (SVP) only where a jury finds, beyond a reasonable doubt, that he or she suffers from a "currently diagnosed mental disorder" that makes him or her likely to recommit after having been punished for prior sexually violent crimes. (§ 6600, subd. (a)(3).) The SVPA's detailed statutory provisions and its implementing regulations set forth in meticulous detail *who* may conduct expert evaluations regarding a person's SVP status (psychiatrists and licensed psychologists designated by the State Department of State Hospitals (DSH) (§ 6601, subd. (d))); *when* those evaluations must be conducted (§ 6601, subd. (a), § 6603, subd. (d)); *how* those evaluations must be conducted (§ 6601, subd. (c)); and the *criteria to be used* in conducting the evaluations and determining whether a person qualifies as an SVP (§ 6600; see also Cal. Code Regs., tit. 9, §§ 4000–4020.1). As the majority rightly concludes, it would conflict with these statutory

<hr>

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

provisions and regulations to allow the People to retain an expert to interview or test the SVPA defendant. (Maj. opn., *ante*, at pp. 12–16.) But it is precisely this reasoning that leads me to a contrary conclusion from the majority with respect to the question of whether the People can retain their own expert to testify at trial on whether a person should be civilly committed. Because the SVPA provides in painstaking detail who should assess the defendant and how that assessment should be done, and because the statute says nothing about permitting the People to retain their own testifying expert, I believe the answer to this question is "no."

The majority's decision undermines the SVPA's carefully calibrated procedural safeguards by allowing the People to simply retain their own expert who may testify free from the constraints of the statutory scheme. Under the majority's holding, a retained expert for hire will be able to opine at trial that an SVPA defendant should be civilly committed as an SVP, even though that expert has not conducted the evaluation per the statute's "standardized assessment protocol" (§ 6601, subd. (c)) and has not even interviewed, met with, or tested the defendant. The majority's holding frustrates the SVPA's "clear intent that the state exercise maximum caution before depriving persons of their liberty on the basis of potential *future* crimes." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 932 (conc. opn. of Werdegar, J.) (*Ghilotti*).)

I dissent from the majority's holding that the People may retain their own expert to testify at an SVPA trial.

## I. DISCUSSION

The SVPA contemplates that as many as *eight* evaluators designated or appointed by the DSH will evaluate the defendant and testify on whether he or she should be civilly committed as

an SVP: two initial evaluators; two more evaluators if the first two disagree; two more if the initial evaluators are no longer available to testify at trial such that the appointment of replacement evaluators is necessary; and two more if the replacement evaluators disagree. (§§ 6601, subds. (d)–(g), 6603, subd. (d)(1).) The SVPA not only designates who must conduct the SVP evaluations, it also details every possible scenario regarding what should be done if the evaluators disagree, or if the evaluations become stale due to the passage of time, or if the evaluators become unavailable to testify at trial. (§§ 6601, subd. (e), 6603, subd. (d).)

The SVPA also provides extensive detail on *how* these evaluations are to be performed. Evaluators must conduct their evaluations " 'in accordance with a standardized assessment protocol' [developed by the DSH] that considers 'diagnosable mental disorders, as well as various factors,' including 'criminal and psychosexual history, type, degree, and duration of sexual deviance, and severity of mental disorder.' " (*Ghilotti, supra*, 27 Cal.4th at p. 910, quoting § 6601, subd. (c).) As the majority acknowledges, the assessment protocol describes everything from the qualifications required of evaluators; the questions they are to address in their evaluations; the test or instruments the evaluators should use in making their assessment of the defendant; which records they are to review; how to conduct a face-to-face clinical interview of the defendant; and the items and citations required for inclusion in the evaluators' forensic reports. (Maj. opn., *ante*, at p. 5; see also Cal. Code Regs., tit. 9, §§ 4000–4020.1.)

The majority shows fidelity to these provisions in correctly concluding that, because the SVPA "limits how formal evaluations are conducted and by whom," the People do not have

the right to independently examine or test the defendant. (Maj. opn., *ante*, at p. 14.) The majority persuasively explains that "independent precommitment interviews and testing would permit an end run around the Act's careful and particularized balancing of the competing interests at play" (*ibid.*) as shown by the Act's "express mandates" concerning evaluations (*id.* at p. 13). The majority goes on to conclude, however, that though "the SVPA circumscribes who may conduct formal evaluations" of the defendant, it is purportedly "silent" as to who might testify at trial. (*Id.* at p. 24.) I disagree. If we believe that the elaborate statutory scheme enunciated by the Legislature precludes importing an unstated right to examine the defendant, then the scheme should similarly foreclose the People from having an unstated right to call a testifying expert.

The majority would have the SVPA's detailed structure delineating precisely how and by whom an SVPA defendant must be evaluated disappear based upon its apparent conclusion that the statute's tight control over evaluations means only that the People cannot hire an expert to conduct a "formal, precommitment evaluation," but they may still hire an expert to give an "opinion" at trial. (Maj. opn., *ante*, at p. 31.) In other words, the majority believes that a DSH-designated expert's *evaluation* under the SVPA is somehow separate and distinct from an expert's *opinion* regarding whether a person qualifies as an SVP. This is a distinction without a difference. Both a privately retained expert's "opinion" and a DSH-designated "evaluation" perform exactly the same function: They offer an expert's view on the ultimate question of whether the defendant should be civilly committed. By requiring a formal evaluation, the SVPA simply provides the process for *how* a DSH expert's opinion regarding whether someone qualifies as an SVP must

be reached. The majority misreads the statute when it concludes that the People can retain their own expert who will simply bypass all of the procedural requirements imposed on the DSH experts in forming his or her opinion. Contrary to the majority's belief, the statute's detailed structure setting forth precisely how and by whom an evaluation must be conducted tells us that the People cannot simply retain an expert who testifies without having adhered to any of these procedural safeguards.

The majority also provides no explanation for why the Legislature would give the People a right the majority believes to be critical to the SVP proceeding (a testifying expert) but then simultaneously hamstring the People by barring the expert from interviewing the defendant, even though DSH evaluators are allowed to — and, in fact, must "make a reasonable attempt to" (Cal. Code Regs., tit. 9, § 4013, subd. (b)) — interview the defendant. The People do not ask for this curious result, I suspect because the People and I have reached the same conclusion: The question of whether the People should be allowed to examine the defendant must be answered in the same way as the question of whether the People may retain an expert to testify at trial as to a person's SVP status. While the majority reaches a compromise — the People may retain a testifying expert, but that expert may not interview or test the defendant — this outcome only ensures that the People's expert is necessarily deprived of the most useful data point for drawing a conclusion on whether the defendant qualifies as an SVP; i.e., talking to and examining the defendant. The better read of the statute's elaborate expert evaluation provisions is that the Legislature did not intend for the People to call their own testifying expert at trial.

5

On their own, the SVPA's directives regarding who must conduct SVP evaluations and how those evaluations must be conducted evince the Legislature's intent to limit the types of expert opinions on which the People may rely at trial. But there is more: The SVPA expressly provides that only one party — the defendant — has "the right to retain experts" to "perform an examination or *participate in the trial* on the [defendant's] behalf." (§ 6603, subd. (a), italics added.) Contrary to the majority's view that the SVPA "is silent as to the type of evidence that may be presented at trial" (maj. opn., *ante*, at p. 24), this provision clearly states that the defendant, and only the defendant, has the right to present a testifying expert at trial. The SVPA contains no similar provision granting the People the right to retain an expert to perform an examination of the defendant or to testify at trial as to whether the defendant qualifies as an SVP. In fact, immediately below the subdivision providing the defendant with the right to retain a testifying expert, the SVPA describes the rights afforded the People, and it gives the People only "the right to demand that the trial be before a jury." (§ 6603, subd. (b).) As the Court of Appeal majority queried, "[i]f the Legislature envisioned both parties retaining testifying experts, why only say the defendant?" (*Needham v. Superior Court* (2022) 82 Cal.App.5th 114, 126 (*Needham*).)

The majority responds to the Court of Appeal's question by observing that section 6603, subdivision (a) pertains only to the defendant's rights at trial. (Maj. opn., *ante*, at p. 26.) The majority further observes that nothing in section 6603, subdivision (b) suggests "it was meant to be an exhaustive list of rights granted to the People at an SVP trial." (Maj. opn., *ante*, at p. 26.) These observations fail to answer why the Legislature

chose to expressly give the defendant, but not the People, a statutory right to a testifying expert at trial. A more straightforward interpretation is the one the Court of Appeal majority supplied: The principle of *expressio unius est exclusio alterius* — " 'the expression of one thing in a statute ordinarily implies the exclusion of other things' " — applies and shows a clear legislative intent that only the defendant may retain a testifying expert to opine at trial on the ultimate issue of whether the defendant meets the statutory criteria for commitment as an SVP. (*Needham*, *supra*, 82 Cal.App.5th at p. 126, quoting *In re J.W.* (2002) 29 Cal.4th 200, 209.) The People are limited to relying on the DSH evaluators' expert opinions at trial.

Additional support for this interpretation is found in sections 6605 and 6608, which govern the procedures for obtaining either unconditional or conditional release after the defendant has already been committed. Unlike at the initial commitment trial, the People are expressly allowed to "have the committed person evaluated by experts chosen by the state" for the purpose of an unconditional or conditional release hearing. (§§ 6605, subd. (a)(3), 6608, subd. (g).) Thus, while the People are allowed to choose their own experts after commitment for the purpose of evaluating and determining whether the committed person still qualifies as an SVP, the statute affords the People with no similar right prior to commitment. These provisions also afford the defendant with the right to "appoint[]" experts (§ 6608, subd. (g)) or be "evaluated by experts" (§ 6605, subd. (a)(3)), illustrating that the Legislature knows how to expressly afford both parties a right to testifying experts when it wishes to do so. They also show that the Legislature's choice

to *not* expressly afford the People with the right to retain a testifying expert for the commitment trial was purposeful.

The majority contends that, because the SVPA is silent on whether the People may retain a testifying expert, the People may do so under the general provisions of the Evidence Code. (Maj. opn., *ante*, at pp. 17–18, 24.) Again, I read the statutory language differently. Section 6603, subdivision (e) states "[t]his section does not prevent *the defense* from presenting otherwise relevant and admissible evidence" at trial. (Italics added.) Though the majority is correct that the statute is noticeably silent as to the People's right to broadly present evidence, including expert testimony, at trial, that silence was intentional. The Legislature originally contemplated adding section 6603, subdivision (e) to clarify that "a former evaluator who is unavailable pursuant to this bill for reasons other than those set out in Evidence Code section 240 can be called as a witness for *the state or the defense* in an SVP matter." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1142 (2001–2002 Reg. Sess.) as amended May 25, 2001, p. L, italics added.) The amendment the Legislature adopted, however, specifies that only *the defense* may present "otherwise relevant and admissible evidence." (§ 6603, subd. (e).) The majority counters that section 6603, subdivision (e) was added only to clarify that a former evaluator who has been deemed unavailable to testify under section 6603, subdivision (d)(2) can nevertheless " 'be called as a witness for the defense in an SVP matter.' " (Maj. opn., *ante*, at p. 29, quoting Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1142, *supra*, at pp. K–L.) While this may be true, the language the Legislature elected to use is quite broad. The Legislature could have specified that the defense may call as a witness a former evaluator who has been deemed

8

unavailable to testify under subdivision (d)(2), but it instead chose to more expansively state that the defense may present "otherwise relevant and admissible evidence." (§ 6603, subd. (e).)

The statute's provision for updated and replacement evaluations provides yet another indication that the People may not retain testifying experts to opine on a person's SVP status at the commitment trial. Section 6603, subdivision (d)(1) states that, if the People determine that updated or replacement evaluations "are necessary in order to properly present the case for commitment [at trial], the [People] may request the [DSH] to perform updated evaluations" or "to perform replacement evaluations." The Legislature added this provision in response to *Sporich v. Superior Court* (2000) 77 Cal.App.4th 422, which held that the People had no statutory authority to obtain updated evaluations. (Maj. opn., *ante*, at pp. 7–9.) By adding this provision, the Legislature addressed a problem raised by *Sporich*: If the People were not able to obtain updated or replacement evaluations, they might not be able to prove at trial that the defendant suffers from "a *currently* diagnosed mental disorder that makes the person a danger to the health and safety of others." (§ 6600, subd. (a)(3), italics added.) Notably, however, the Legislature did not authorize the People to hire their own expert to conduct an independent evaluation or to provide an independent opinion regarding whether the defendant qualifies as an SVP. Instead, the Legislature provided a means for the People to obtain updated or replacement evaluations *from the DSH*. If the Legislature believed the People already had the authority under the Evidence Code to hire their own testifying expert to opine on a person's status as an SVP, then it is unclear why it believed

that, without giving the People the authority to seek updated or replacement evaluations, the People might fail to prove their case at trial and "the petition could be denied." (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 2018 (1999–2000 Reg. Sess.) as amended April 11, 2000, p. 5; see also maj. opn., *ante*, at p. 8.)

Importantly, the People may not seek updated or replacement evaluations from the DSH simply because they disagree with the DSH evaluators' opinions. Instead, the evaluations must be stale (i.e., more than a year old) and, thus, in need of updating (Cal. Code Regs., tit. 9, § 4020; see also *id.*, § 4020.1), or the evaluator who conducted the initial evaluation must be "no longer available to testify" (§ 6603, subd. (d)(1)). And while a retired evaluator is generally considered to be unavailable to testify, the statute prohibits the People from replacing a retired evaluator who previously determined that the defendant *did not* meet the criteria for commitment. (§ 6603, subd. (d)(2)(D).) That is, the People may not replace an evaluation that concludes the defendant *is not* an SVP with a new evaluation that concludes the alleged SVP *is* an SVP. (*Ibid.*) The Act thereby deliberately limits the circumstances by which the People may seek updated or replacement evaluations. The majority's holding, however, creates an end run around these provisions: Even where an evaluator cannot be replaced because his or her "most recent evaluation" found that the defendant "*does not* meet the criteria for commitment" (§ 6603, subd. (d)(2)(D), italics added), the People can now simply hire their own expert to testify that the defendant *does* meet the criteria for commitment. Essentially, the majority's holding allows the People to obtain a replacement expert opinion "free of the restrictions" of section 6603, subdivision (d)(1). (*Needham*,

*supra*, 82 Cal.App.5th at p. 126.) The majority does not explain why the Legislature would impose a set of constraints on the People's ability to obtain updated or replacement evaluations from the DSH but would, at the same time, impose zero constraints on the People's ability to seek a separately retained expert's opinion as to whether someone qualifies as an SVP.

Indeed, it is not clear why the People would ever seek an updated or replacement DSH evaluation — the opinion of which is unknown at the time of the People's request — when, under the majority's holding, the People may simply hire their own expert who they can control, have unfettered access to, and know what his or her intended testimony will be prior to trial. The majority rejects the "Court of Appeal majority's suggestion that any expert presented by the People must, of necessity, be biased" since "[n]ot every professional disagreement signifies an impermissible bias." (Maj. opn., *ante*, at p. 18.) The majority fails to acknowledge, however, that evaluators are designated by the DHS without regard to what their eventual opinion might be. In contrast, testifying experts are retained to support the party's position at trial, and it seems unlikely that the People would retain and pay an expert for the purpose of giving an opinion that is adverse to the People's position at the commitment trial. This is not a function of "bias" (*ibid*.); it is instead a function of how our trial system works. Lawyers seek to present trial witnesses that support their own position and not the position of their adversary.

Moreover, pursuant to the majority's holding, even where *none* of the updated or replacement evaluations conclude that the person being tried currently suffers from a mental disorder that makes him or her presently dangerous and likely to reoffend, the People could nevertheless retain their own expert

to contrarily opine that the person does, in fact, qualify as an SVP. It is not difficult to envision a scenario in which two initial DSH evaluators agree that the defendant qualifies as an SVP, allowing the People to file an initial commitment petition under section 6601, subdivision (i), but then the initial evaluators change their minds, or the replacement evaluators disagree with the initial evaluators' opinions. As we recently acknowledged in our decision in *Camacho v. Superior Court* (2023) 15 Cal.5th 354, years-long delays between the probable cause hearing and trial occur with some frequency. (*Id.* at p. 376 & fn. 2.) During such delays, SVPA defendants are "placed in a state hospital" (§ 6602.5, subd. (a)) and receive "mental health treatment while they await trial" (*Camacho*, at p. 393). This is how the statute is supposed to operate: "Pretrial treatment of the underlying mental disorder that caused the state to seek commitment in the first place may ultimately facilitate the individual's release before trial." (*Ibid.*) Simply put, treatment might work. Under the majority's holding, however, a scenario could arise in which several years pass between the probable cause hearing and trial and, during that time, the DSH evaluators all submit updated evaluations opining that the defendant has been successfully treated and no longer qualifies as an SVP. And yet the People could retain their own expert to opine — without having conducted the evaluation contemplated by the SVPA or even meeting with the alleged SVP — that the person still qualifies as an SVP. As long as a jury agrees with the People's expert's view, the defendant would be committed even though the People's expert did not follow the SVPA's detailed evaluation protocols.

The majority emphasizes the "prosecutorial discretion built into the SVPA scheme." (Maj. opn., *ante*, at p. 23.) Quoting

*Reilly v. Superior Court* (2013) 57 Cal.4th 641, 648, the majority observes that " '[m]andatory dismissal is not required where one or both of the later evaluators conclude the individual does not meet the criteria for commitment.' " (Maj. opn., *ante*, at p. 23.) The issue in *Reilly* was whether dismissal of an SVP petition was mandatory based on legal errors in the initial DSH evaluations; we held that dismissal was only mandatory if the errors were material. (*Reilly*, at p. 646.) The majority reads statements we made in *Reilly*, such as a need to avoid " 'unnecessary strictness' " in interpreting the statute and a desire for " 'commitment petitions be adjudicated on their merits' " (maj. opn., *ante*, at p. 22, quoting *Reilly,* at p. 656), as support for the conclusion that the People have the right to present their own testifying expert. But *Reilly* says nothing about the People's right to retain a testifying expert and reading it to provide guidance on this issue seems especially inapt since we specifically identified in *Reilly* the remedy the People should take if they want to challenge DSH evaluations: request updated evaluations from the DSH, not hire a testifying expert. (*Reilly*, at p. 657.)

Moreover, no one is contending that mandatory dismissal is required, even in a case where the updated or replacement evaluations agree that the person no longer meets the statutory criteria for commitment as an SVP. The point is that, in a case where every neutral DSH evaluator agrees at the time of the commitment trial that the defendant should not be committed, it may well be quite difficult for the People to convince a jury that they should nonetheless commit the defendant as an SVP, and the People may well wish to dismiss the case in such circumstances. (*Gray v. Superior Court* (2002) 95 Cal.App.4th 322, 329 [if the new evaluations agree "that the subject person

does not at the present time meet the criteria of the Act, the prosecuting attorney might well elect to dismiss the proceeding" (fn. omitted)].) Given the significant impairment of liberty occasioned by commitment, my view is that this is exactly the balance the Legislature intended to strike. The Legislature did not intend for the People to be able to circumvent the scheme by hiring their own expert to contradict the DSH evaluators' opinions that the defendant no longer qualifies as an SVP.

The majority additionally suggests that the DSH evaluations are just screening tools used to determine whether a petition for commitment should be filed, and that the evaluations are not relevant to the question of what evidence should be presented *at trial*. (Maj. opn., *ante*, at p. 21 [the "role of DSH evaluations" is " 'to ensure that SVP proceedings are initiated only when there is a substantial factual basis for doing so' "].) But while the initial evaluations performed under section 6601, subdivision (d) are indeed used to determine whether SVP proceedings should be initiated, the majority ignores section 6603 which, as explained above, clearly contemplates that the evaluators will present their opinions *at trial*. (See, e.g., § 6603, subd. (d)(1) ["If one or more of the original evaluators is no longer available to *testify*" for the People at trial, the People may request the DSH "to perform replacement evaluations" (italics added)].) Thus, section 6603 makes clear that the evaluation process is not just an initial screening process because the section lays out a procedure for DHS evaluators to testify at trial. The majority's reading of section 6601 as merely relating to "screening" fails to interpret the statutory scheme as a whole.

Lastly, the majority relies on our decision in *People v. Superior Court* (*Smith*) (2018) 6 Cal.5th 457, wherein we held that the People are entitled to a consulting expert. The majority

14

posits that it would be "incongruous" to find, as we did in *Smith*, that the People may retain a consulting expert to help them understand the DSH evaluations and to cross-examine DSH evaluators at trial, and "yet bar the testimony of that same expert to assist the trier of fact." (Maj. opn., *ante*, at p. 24.) I disagree. In *Smith* we recognized that consulting experts can provide valuable assistance to the People — short of testifying — such as helping the People to "grasp the scientific nuances underlying another expert's opinion" (*Smith*, at p. 469) and assisting with cross-examination of the defendant's experts or the DSH evaluators (*id.* at p. 471). In addition, consulting experts can identify legal errors made by the defendant's experts or the DSH evaluators and assist the People in raising those errors with the court. They can also help the People to assess whether to proceed with the case at all, especially if updated evaluations determine that the defendant no longer meets the statutory criteria for commitment as an SVP. I believe it is perfectly consistent with the SVPA's statutory scheme to permit the People to retain a consulting expert to advise the People and help them understand the strength of their case while also prohibiting the People from presenting a testifying expert at trial — an expert who has not adhered to any of the detailed requirements set forth in the statute.

## II. CONCLUSION

In sum, the SVPA lays out in meticulous detail who may evaluate SVPA defendants and how they must go about determining whether a defendant should be civilly committed. Such details include what to do if an evaluator retires or if an evaluation becomes stale, the assessment protocol evaluators must use, and how evaluators should conduct a face-to-face interview with the alleged SVP. (Maj. opn., *ante*, at p. 5; see also

Cal. Code Regs., tit. 9, §§ 4000–4020.1.) The statute also expressly gives the defendant the right to call his or her own testifying expert but provides no such right to the People. (§ 6603, subds. (a) & (b).) Given the important liberty interests at stake, we should not import into the statute a right that is not described in the statute itself. The majority not only grants the People a right that the Legislature expressly omitted — i.e., the right to call a testifying expert at trial to opine on whether the defendant qualifies as an SVP — it hamstrings that right by forbidding the People's expert from interviewing or testing the defendant. If the Legislature wishes to afford the People with the authority to retain and call a testifying expert, it can — consistent with due process requirements — enshrine such a right in the statute via future legislation. But this court should not write such authority into a carefully calibrated statutory scheme that does not permit it.

I dissent from the majority's holding that the People may retain a testifying expert under the SVPA.

**GROBAN, J.**

**I Concur:**

**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Needham v. Superior Court

———————————————————————————————

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 82 Cal.App.5th 114
**Review Granted (unpublished)**
**Rehearing Granted**

———————————————————————————————

**Opinion No.** S276395
**Date Filed:** July 1, 2024

———————————————————————————————

**Court:**  Superior
**County:**  Orange
**Judge:**  Elizabeth G. Macias

———————————————————————————————

**Counsel:**

Martin Schwarz, Public Defender, Laura Jose, Chief Deputy Public Defender, Adam Vining, Assistant Public Defender, and Elizabeth Khan, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Todd Spitzer, District Attorney, and Yvette Patko, Deputy District Attorney, for Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Elizabeth Khan
Deputy Public Defender
801 Civic Center Drive West, Suite 400
Santa Ana, CA 92701
(657) 251-6090

Yvette Patko
Deputy District Attorney
300 North Flower Street
Santa Ana, CA 92703
(714) 347-8780